LEWIS H. V. MAY AND NANCY C. MAY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5762–77.    Filed January 8, 1981.

*Dean S. Butler and Henry P. Pramov, Jr.*, for the petitioners.
*John W. Harris, Steven S. Heyman*, and *David P. Fuller*, for the respondent.

EKMAN, *Judge*: The Commissioner determined a deficiency of $7,577 in the petitioners' Federal income tax for 1973. Due to concessions by the parties, the only issue for decision is whether

the amounts paid as rent by Dr. May in 1973 to an irrevocable trust created by the petitioners for the benefit of their children constituted an ordinary and necessary business expense under section 162(a) of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Lewis H. V. and Nancy C. May, husband and wife, maintained their legal residence in Arcadia, Calif., when they filed their petition in this case. They filed a joint Federal income tax return for 1973 with the Internal Revenue Service, Fresno, Calif.

During the taxable year 1973, Lewis H. V. May was a doctor of medicine engaged in the general practice of medicine at 5807 Temple City Boulevard, Temple City, Calif. The doctor had been conducting his practice in a building situated on such property for some years prior thereto. The petitioners owned, as tenants by the entirety, the land and medical building at 5807 Temple City Boulevard (the medical property), which was encumbered by a mortgage.

In 1970, Dr. May contacted an attorney for the purpose of arranging a transfer of the medical property in trust. The attorney drafted a declaration of trust setting forth that the "Trustors," the petitioners, "have delivered" to Lewis H. V. May and Harlos Gross, as "Trustees," all their right, title, and interest in and to the medical property. In the declaration, the trustees acknowledged delivery of the property to them and agreed to hold the property in trust for the benefit of the petitioners' four children. On January 15, 1971, Dr. May and Mr. Gross executed the declaration as trustees, and petitioners, as trustors, executed the following statement, which was attached to the declaration: "We certify that we have read the foregoing Declaration of Trust (Irrevocable), and that it correctly states the terms and conditions under which the Trust Estate is to be held, managed and disposed of by the Trustees. We approve the

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during 1973.

Declaration of Trust in all particulars, and have requested the Trustees to execute it." The declaration described the medical property as having a value of $46,504 and encumbered by trust deed notes aggregating $21,619.

The petitioners first became acquainted with Mr. Gross in 1957. Mr. Gross owned the grocery store at which the petitioners shopped, and he became acquainted with the May family. He also participated in various civic organizations with Dr. May. Mr. Gross and his family had, at various times, been patients of Dr. May. Mr. Gross was not related to the petitioners by blood or marriage. Mr. Gross had been a trustee of other trusts and was familiar with the duties of a trustee. He served as trustee of the May trust without compensation.

The declaration of trust creates four separate irrevocable trusts, one for the benefit of each of the petitioners' children. The income is payable currently, except that during the minority of a beneficiary, his share of the income is accumulated until he reaches age 21. The trustees are given the power to apply either income or corpus for the education, maintenance, medical care, or support of a beneficiary but not in discharge of any parental obligation of petitioners. The trustees are required to distribute any accumulated income and corpus to a beneficiary when he attains age 25.

The trust cannot be amended, altered, or revoked by any person prior to termination. In the declaration of trust, the trustors "relinquish, absolutely and forever, all their possession of, or enjoyment of, or right to or income from, the Trust property" and "expressly renounce for themselves, and for their estates, any and all interest, either vested or contingent, including any reversionary interests or possibility of reverter, in the income or corpus of these Trusts." The declaration of trust further provides that no part of the corpus or income of the trust should ever be used for the benefit of the trustors nor should it be used to pay premiums on insurance policies on their lives or to satisfy their legal obligations. Trustors relinquish all further right to designate, alter, amend, or in any way change the designation of beneficiaries.

Under the declaration of trust, the trustees are given broad

powers to manage the trust property, including the powers to lease the property, to make improvements, to borrow money, and to invest trust assets in both low-risk and speculative ventures. The declaration specifically vests the trustees with "all the rights, powers and privileges which an absolute owner of the same property would have." However, the powers of the trustees are subject "always to the discharge of their fiduciary obligations" and to the exercise of reasonable prudence in making investments. Also, neither the trustors nor the trustees are allowed to deal with or dispose of the corpus or income of the trust for less than an adequate consideration, nor can they borrow all or part of the trust corpus or income without adequate interest or security.

The declaration of trust makes no provisions for resolving disputes which may arise between the two trustees. It designates the individuals to succeed Dr. May and Mr. Gross as trustees, with the limitation that Dr. and Mrs. May shall not serve as trustees at the same time. The original trustees are to receive no compensation, but compensation is to be paid to successor trustees.

The names and birth dates of the petitioners' children are as follows:

| | |
|---|---|
| Charles H. V. May | Nov. 30, 1954 |
| Robert Cass May | July 9, 1956 |
| Matthew Franklin May | Feb. 24, 1958 |
| Lewis H. V. May II | Nov. 22, 1960 |

The trustors executed a deed transferring title to the medical property to the trustees. The deed was acknowledged on September 20, 1973, and was recorded in the official records of Los Angeles, Calif., on October 2, 1973. The deed was actually prepared at the time of the execution of the declaration of trust. Although the deed now bears an execution date of September 20, 1973, the original execution date on the deed had been erased.

After January 15, 1971, the petitioners and the cotrustees proceeded as if all the necessary steps had been taken to establish the trust for the medical property. Dr. May was the sole occupant of such property prior to the execution of the

declaration of trust, and thereafter, he continued to be the sole occupant of such property. Gift tax returns were timely filed by the petitioners reflecting the gift of their interests in the property. A fiduciary income tax return was filed by the trust for each of the taxable years 1971, 1972, and 1973, in which deductions were claimed for distributions of income to the beneficiaries. From 1971 through 1973, the trust paid the installments on the mortgage on the medical property.

When the declaration of trust was executed, it was understood that the trustees would enter into a lease with Dr. May for the rental of the medical property whereby he would pay all taxes, insurance, utilities, and other operating expenses, and a rental of $1,000 per month. The petitioners' attorney prepared a rough draft of the lease. In April 1972, the attorney left private practice and turned the matter over to another law firm. The lease was never executed. During the taxable years 1971 through 1973, Dr. May paid $1,000 per month to the trust as rent; he also paid taxes and other expenses of the property. Mr. Gross assumed that there was an executed lease and that title to the property had been transferred to the trust, but he made no independent investigation to determine whether a lease had been executed and the transfer completed. However, Mr. Gross testified that he "checked the checkbook about four times a year" and "looked to see if the rent had been paid." A rental of $1,000 per month net to the trust was a reasonable rental for the medical property.

On their Federal income tax return for 1973, the petitioners deducted the payments made by Dr. May as rent. In his statutory notice of deficiency, the Commissioner disallowed the entire deduction. In explanation thereof, the Commissioner stated that:

> The deduction claimed of $12,000.00 for rent on business property paid to a family trust is not allowed because it has not been established that these expenses were incurred or, if incurred, were expended for ordinary and

necessary business expense. Therefore, your taxable income is increased by such amount.

## OPINION

The only issue in this case is whether the payments made by Dr. May as rent in 1973 were ordinary and necessary business expenses under section 162(a). In part, that section provides:

There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\*　\*　\*　\*　\*　\*　\*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

The Commissioner concedes that the payments were made by Dr. May, that such payments constituted reasonable rental for the medical property, and that such property was used in Dr. May's medical practice. Nevertheless, the Commissioner contends that the payments are not deductible because the transfer in trust should not be recognized for tax purposes. In the first place, he argues that under California law, a valid trust was not created because there was no effective transfer of the medical property in trust. In the alternative, he argues that even if such transfer took place, the trust should not be recognized for tax purposes because Dr. May never relinquished control of the medical property.

The Commissioner's alternative argument will be considered first, and for purposes of such consideration, we shall assume that the medical property was transferred in trust before 1973. Yet, such fact by itself does not entitle the petitioners to the deduction for rent. When a taxpayer transfers property to a trust and names the members of his family the beneficiaries and himself the trustee, the transaction must be closely scrutinized to determine whether substance comports with form.[2] *Helvering*

---

[2]Whether a transfer of property to a trust is recognized for tax purposes determines not only whether a deduction is allowable to the grantor for the rent paid by him on the leaseback of such property, but also whether the grantor is taxable on the trust's income. In secs. 671–676, Congress enacted specific rules to determine who is taxable on a trust's income, but such rules have no bearing on the deduction issue. *Penn v. Commissioner*, 51 T.C. 144, 150 (1968); *Lerner v. Commissioner*, 71 T.C. 290, 299 (1978).

*v. Clifford*, 309 U.S. 331, 335 (1940); *Penn v. Commissioner*, 51 T.C. 144, 149–150 (1968); *Van Zandt v. Commissioner*, 40 T.C. 824 (1963), affd. 341 F.2d 440 (5th Cir. 1965), cert. denied 382 U.S. 814 (1965). In *Mathews v. Commissioner*, 61 T.C. 12 (1973), revd. 520 F.2d 323 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976), this Court drew upon the numerous decisions dealing with whether the grantor of such a trust may deduct payments made by him to the trust as rent, and we set forth the following criteria for deciding whether the deduction is to be allowed:

(1) The grantor must not retain substantially the same control over the property that he had before he made the gift.

(2) The leaseback should normally be in writing and must require payment of reasonable rent.

(3) The leaseback (as distinguished from the gift) must have a bona fide business purpose.[3]

(4) The grantor must not possess a disqualifying "equity" in the property within the meaning of section 162(a) (3).

Since *Mathews*, we have continued to rely upon these criteria in deciding cases involving gift-leaseback transactions. E.g., *Lerner v. Commissioner*, 71 T.C. 290 (1978); *Quinlivan v. Commissioner*, T.C. Memo. 1978–70, affd. 599 F.2d 269 (8th Cir. 1979), cert. denied 444 U.S. 996 (1979); *Serbousek v. Commissioner*, T.C. Memo. 1977–105.

Here, during 1973, the petitioners did not have an equity in the medical property in the sense of a property right "which traditionally would have been enforceable by means of an equitable remedy." *Oakes v. Commissioner*, 44 T.C. 524, 531 (1965). Under the declaration of trust, the sole equitable owners of the property were the petitioners' children. Moreover, Dr. May required the property for his medical practice, and there-

---

[3]The Commissioner vigorously argues that a gift-leaseback is in substance a single transaction, and that unless there is a business purpose for the entire arrangement, the transaction should not be recognized. However, we have considered such argument numerous times and have declined to adopt it. See *Lerner v. Commissioner*, 71 T.C. 290, 300 (1978); *Mathews v. Commissioner*, 61 T.C. 12 (1973), revd. 520 F.2d 323 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976); *Oakes v. Commissioner*, 44 T.C. 524, 532 (1965); see also *Skemp v. Commissioner*, 168 F.2d 598 (7th Cir. 1948), revg. 8 T.C. 415 (1947); *Brown v. Commissioner*, 180 F.2d 926 (3d Cir. 1950), revg. 12 T.C. 1095 (1949); compare *Perry v. United States*, 520 F.2d 235 (4th Cir. 1975), cert. denied 423 U.S. 1052 (1976); *Audano v. United States*, 428 F.2d 251 (5th Cir. 1970). We perceive no reason to reconsider the matter in this case.

fore, the leaseback had a bona fide business purpose. *Lerner v. Commissioner, supra* at 302.

Our statement in *Mathews* that the leaseback should "normally" be in writing reflects our view that the requirement of a written lease is not absolute. See *Brooke v. United States,* 468 F.2d 1155 (9th Cir. 1972), affg. 300 F. Supp. 465 (D. Mont. 1969). While there was no written lease of the trust property, we are satisfied on the present record that the terms of the lease were clearly understood by the trustees and faithfully observed by the parties. Accordingly, we feel that the requirement of a written lease need not be imposed here.

The requirement that the rent be reasonable finds its roots in the statutory mandate that the rent be "required." Sec. 162 (a) (3). In seeking to determine whether reasonable rent was paid as evidencing payment of a required rent, courts have sometimes examined the lessor/trustee to determine whether he is independent of the lessee/grantor. Where, as here, the reasonableness of the rent paid is conceded, inquiry into the independence of the lessor is unnecessary to make the requisite determination to satisfy *this* prong of the *Mathews* test.

The remaining prong of the *Mathews* test—that the grantor must not retain substantially the same control over the property that he had before he made the gift—has also caused courts to consider the independence of the trustee in a gift-leaseback situation. As the Ninth Circuit stated: "Many decisions pivot on the issue of the independence of the trustee." *Brooke v. United States,* 468 F.2d at 1157.

In the present case, it is noteworthy that the gift of the property by petitioners to the trust was of their entire interest in the property and irrevocable. This distinguishes the instant case from those involving a transfer in trust with a reversion to the grantor. See, e.g., *Helvering v. Clifford, supra; Van Zandt v. Commissioner, supra; Penn v. Commissioner, supra.*

Nor does the instant case involve a sole trustee who is also the grantor. The trustees herein are Dr. May and Mr. Gross. At the trial, Mr. Gross testified that as trustee he felt independent of Dr. May. Mr. Gross had previously served as a trustee for other trusts, and testified that he was aware of the fiduciary nature of the position and of the statutory liability imposed on trustees by the State of California. Cal. Civ. Code Ann. secs. 2228–2239 (West 1954). See *Goodman v. Commissioner,* 74 T.C. 684 (1980),

and cf. *Brooke v. United States, supra.* Mr. Gross monitored the rental payments to the trust through examination of the checkbook each quarter.

While Mr. Gross might have expended more time and exercised more detailed supervision of the day-to-day operations of the trust, we are persuaded that, under the present facts, his actions as trustee were sufficient to establish his independence. The management of the trust corpus, due to its size and lack of complexity, required no more. Accordingly, we need not decide whether an independent trustee is required in every gift-leaseback case, for we are satisfied that Mr. Gross is sufficiently independent to meet the tests of *Mathews*: the rent paid under the lease was reasonable, the leaseback had a bona fide business purpose, the grantors did not possess a disqualifying equity in the property; and the grantors' control over the property was not substantially the same control possessed before the gift.

Concerning respondent's first argument—that under California law, a valid trust was not created because there was no effective transfer of the medical property in trust—we find that the trust instrument effectuated a valid transfer. *Keogh v. Noble,* 136 Cal. 153, 68 P. 579 (Cal. 1902); *Olsen v. Cornwell,* 134 Cal. App. 419, 25 P.2d 879 (1933); Cal. Civ. Code Ann. secs. 2221, 2222, 1091 (West 1954). In this regard, we need not consider the deed which petitioners alternatively introduced as evidence of the transfer. See *Weiner v. Mullaney,* 59 Cal. App. 2d 620, 140 P.2d 704 (1943). The declaration of trust adequately declared the trust of the property and accomplished the necessary transfer of petitioners' entire right, title, and interest in the property to the trust on January 15, 1971. That being the case, and all other criteria for deductibility having been met, we hold that petitioners are entitled to deduct the rental paid by Dr. May for the use of the medical property.

Due to concessions by the parties,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

DAWSON, *J.,* did not participate in the consideration or disposition of this case.

GOFFE, *J.*, concurring: Dr. May is undoubedly entitled to deduct the rentals paid to the trust in 1973. However, I arrive at this conclusion in quite a different manner than does the majority. Those reading the majority's opinion are no doubt confused by its treatment of the "independent trustee" requirement. It first announces that the independence of the trustee is an important consideration; it then makes the critical finding that the trustees in the instant case were independent of Dr. May; and, finally, it announces that "we need not decide whether an independent trustee is required in every gift-lease-back case." (Majority opinion at p. 15.) To the extent that such treatment implies that the trustees in the present case must be independent of Dr. May as a prerequisite to his deduction of the rental payments, I disagree. Where, as here, the grantors have transferred away their entire right, title, and interest in the trust property, my analysis of the applicable statute and relevant case law leads me to the inescapable conclusion that the independence of the trustees is irrelevant except in cases where the reasonableness of the rental paid is disputed.

The misplaced emphasis on the independence of the trustees which is implicit in the majority opinion and explicit in the opinions of the dissenters is merely the end of a long slide down a slippery slope onto which we inadvertently stepped years ago. This case presents a golden opportunity to set forth a coherent treatment of gift-leaseback transactions. However, in order to explain where we should go, we must understand from whence we have come.

Before I delve into the evolution of the jurisprudence of the tax treatment of gift-leaseback transaction, we should concisely identify the issue with which we are here concerned—the deductibility under section 162(a)(3) of the rentals paid by a grantor (here Dr. May) to a trust to which he transferred the property which he is leasing. We have not been asked to determine which taxpayer, i.e., petitioners, the income beneficiaries, or the trust, is taxable on the income of the trust. Therefore, the only statutory standard which we must analyze in order to decide whether the rentals paid are deductible is section 162, specifically section 162(a)(3), which provides:

SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL. —There shall be allowed as a deduction all the ordinary and

necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\*      \*      \*      \*      \*      \*      \*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

Under the statutory language, several tests must be met to ensure deduction of rentals paid. A recent decision outlines those tests, as follows:

Congress has expressly provided for the deduction of rental expenses where:
(1) the payments are required to be made for the continued use or possession of the property;
(2) the continued use or possession of the property is for purposes of the trade or business;
(3) the taxpayer has not taken and is not taking title to the property; and
(4) the taxpayer has no equity in the property.
[*Quinlivan v. Commissioner*, 599 F.2d 269, 272 (8th Cir. 1979), affg. a Memorandum Opinion of this Court, cert. denied 444 U.S. 996 (1979).]

As one can see from close inspection, all of the above-listed tests originate in the statutory language, as well they should. I point out this fact because I have determined, after an exhaustive review of the relevant case law, that some confusion[1] concerning the tax treatment of gift-leaseback transactions has arisen because of the creation of an independent test that is not grounded in the relevant statutory language.

This Court's most recent decision concerning a gift-leaseback transaction is *Lerner v. Commissioner*, 71 T.C. 290 (1978). Therein was stated a four-part test for determining the deductibility of the rentals paid in a gift-leaseback situation. The requirements are:

(1) The grantor must not retain substantially the same control over the property that he had before he made the gift;

(2) The leaseback should normally be in writing and must require payment of a reasonable rental;

---

[1]Courts and commentators have mentioned the confusion existing in this area of the tax law. See *Brooke v. United States*, 468 F.2d 1155, 1159 (9th Cir. 1972) (Ely, *J.*, dissenting); "Tax Court Again Allows Rent Deduction in Trust-Leaseback Arrangement," 50 J. Tax. 107 (Feb. 1979); and, most recently, J. Canfield, "Clifford Trusts: A New View Towards Leaseback Deductions," 43 Alb. L. Rev. 585 (1979), wherein the author states, "The issue of whether a grantor may deduct such rental payments has led to frequent litigation and inconsistent judicial decisions."

(3) The leaseback (as distinguished from the gift) must have a bona fide business purpose; and

(4) The grantor must not possess a disqualifying equity in the property within the meaning of section 162(a)(3).

This statement of the prevailing tests in the gift-leaseback area was not newly fashioned by us in *Lerner v. Commissioner, supra*. It was a mere restatement of the applicable requirements first set forth in *Mathews v. Commissioner*, 61 T.C. 12 (1973), revd. 520 F.2d 323 (5th Cir. 1975). This Court has adhered to those standards up to the present time (*Serbousek v. Commissioner*, T.C. Memo. 1977–105; *Quinlivan v. Commissioner*, T.C. Memo. 1978–70), except when the *Golsen* [2] rule has forced us to ignore them, e.g., *Butler v. Commissioner*, 65 T.C. 327 (1975).

After close inspection of the origins of the four-part *Mathews* test, I see no need to abandon any portion of those standards. However, a clarification of some parts of that test does seem to be merited in light of the aforementioned confusion that currently permeates this area of the tax law.

The origins and interpretation of three of the four *Mathews* standards are reasonably clear. I will here briefly analyze those three tests, which include the second, third, and fourth standards listed above.[3]

### Test 2. The Leaseback Should Normally Be in Writing and Must Require Payment of a Reasonable Rental

The meaning of this test (actually two tests) is self-evident. The requirement that the leaseback be in writing is appropriately modified by the word "normally." This requirement is not found in the statutory language of section 162(a)(3), but is rather an effort by the courts to solve a problem of proof that often arises in these cases, i.e., the existence of a binding commitment by the lessee to pay an agreed-upon rental to the lessor. As intimated by the use of the limiting modifier "normally," the requirement of a written lease is not absolute. *Brooke v. United States*, 468 F.2d 1155 (9th Cir. 1972), affg. 300

---

[2] *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).

[3] I am numbering the four *Mathews* tests as they were numbered by this Court in *Lerner v. Commissioner*, 71 T.C. 290 (1978).

F. Supp. 465 (D. Mont. 1969). If other evidence can be introduced to prove the existence of a binding lease agreement, the requirement of a written lease may be dispensed with. Where, as here, there is an undisputed rental agreement and consistently paid rentals equal to the agreed-upon amount, we, as a court, have no need of a written lease. The intransigent position of Judge Wilbur in his dissent in effect writes the word "normally" out of the *Mathews* test which he so fervently embraces.

The other portion of this test, that of requiring the rent paid to be reasonable, finds its roots in the statutory mandate that the rent be "required." Normally, the push and pull of the market place will ensure that a reasonable rental is agreed upon by the parties to a lease. However, when the parties to a lease are related, an inquiry into what constitutes a reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with the lessor. *Sparks Nugget, Inc. v. Commissioner*, 458 F.2d 631 (9th Cir. 1972), affg. a Memorandum Opinion of this Court, cert. denied 410 U.S. 928 (1973). This being the law, we are often forced to examine the trustee/lessor to determine whether he is independent of the grantor/lessee. However, such examination is needed only because the court must decide whether the rent paid was "required," as that term is used in the controlling statute. Though the lack of an independent trustee may force a court to inquire into the reasonableness of the rent agreed upon, it does not result in an automatic judicial annulment of a gift-leaseback transaction under this prong of the *Mathews* test.

In the present case, the requirements of the second prong of the *Mathews* test have been met. Though the parties to the lease never executed a written lease, they at all times proceeded in accordance with the terms upon which they had agreed. As stated above, the requirement of a written lease may be dispensed with if adequate proof is introduced to prove the existence of a binding lease agreement. Such proof was introduced, and I have no trouble finding the existence of a binding lease agreement.

As for the requirement that the rent be reasonable, the parties stipulated that the rentals paid to the trust by Dr. May were reasonable in amount. Thus, we need not inquire, for purposes of determining the reasonableness of the rentals paid, into the

independence of the trustees of the trust/lessor. Judge Wilbur, in his dissent, makes much of the fact that the parties' stipulation did not cover the whole 10-year period of the lease. In so doing, he completely misapprehends the function of such stipulation. Under section 162(a)(3), the rentals paid must be reasonable. The only rentals in issue are those paid in 1973. Thus, for purposes of this prong of the *Mathews* test, we need concern ourselves only with the reasonableness of the rentals paid in 1973. I do not understand Judge Wilbur's unwillingness to accept the stipulation of the parties on this issue.

### *Test 3. The Leaseback (as Distinguished From the Gift) Must Have a Bona Fide Business Purpose*

This part of the *Mathews* test finds its roots directly in the statutory language which requires that the "continued use or possession" of the property be for the purposes of a trade or business. Sec. 162(a)(3). The only uncertainty that has arisen concerning the meaning of this statutory business-purpose test is whether the gift, as well as the leaseback, must have a business purpose. The content of the question would seem to provide its own answer. It seems inconsistent to contend that a gift must have a business purpose. A gift proceeds from detached and disinterested generosity. *Commissioner v. Duberstein*, 363 U.S. 278 (1960). I am not aware of any other area of the tax law where it has been suggested that a gift, in order to be valid, must have a business purpose. However, the U.S. Court of Appeals for the Fifth Circuit, in a series of gift-leaseback cases, has announced that the gift portion of a gift-leaseback transaction, as well as the lease portion of the transaction, must have a business purpose. *Van Zandt v. Commissioner*, 341 F.2d 440 (5th Cir. 1965), affg. 40 T.C. 824 (1963), cert. denied 382 U.S. 814 (1965); *Mathews v. Commissioner, supra*; *Audano v. United States*, 428 F.2d 251 (5th Cir. 1970), revg. an unreported case (N.D. Tex. 1969, 23 AFTR 2d 69–1020, 69–1 USTC par. 9354); *Chace v. United States*, 303 F. Supp. 513 (M.D. Fla. 1969), affd. per curiam 422 F.2d 292 (5th Cir. 1970); *Furman v. Commissioner*, 381 F.2d 22 (5th Cir. 1967), affg. 45 T.C. 360 (1966). The Fifth Circuit crossed the Rubicon on this issue in the *Van Zandt* case, based upon its reliance on and interpretation of a sale-leaseback case. *Armston v. Commissioner*, 188 F.2d 531 (5th Cir. 1951), affg. 12 T.C. 539 (1949). The fact that *Armston* was a sale-

leaseback case, as opposed to a gift-leaseback case, casts doubt on the Fifth Circuit's heavy reliance on that case in *Van Zandt*, a gift-leaseback case. Contrary to the Fifth Circuit's apparent interpretation of that case, I find it doubtful that *Armston* stands for the proposition that a bona fide transfer (gift or sale) which is undoubtedly absolute must meet a business purpose test in order to effectively transfer "real" ownership of the transferred property to the transferee. The opinion in *Armston* cited the lack of business purpose for the sale as a factor which led the court there to disregard the bona fides of the sale. The sale thus having been disregarded, the purported lessee was found to still own the property. As I will discuss below, one may not deduct rentals paid for the use of property in which he has a disqualifying equity. The taxpayer, having been found to constructively own such a disqualifying equity, was denied the deduction of the rentals paid. Thus, *Armston v. Commissioner, supra*, stands for the proposition that a sale lacking in business purpose will be disregarded, leaving the purported seller/lessee with a disqualifying equity. The Fifth Circuit in *Van Zandt v. Commissioner, supra*, however, extended this holding. Whereas the court in *Armston v. Commissioner, supra*, used the lack of business purpose in a sale transaction to deny the validity of the transfer, it used such lack of business purpose in *Van Zandt v. Commissioner, supra*, to deny the deductibility of rentals paid, albeit that the validity of the gift transfer was not questioned. Since, under *Commissioner v. Duberstein, supra*, a lack of business purpose can in no way defeat the validity of a gift, the donor of the gift cannot be deemed to have retained a disqualifying equity in the property. My determination that the lessee in a gift-leaseback transaction where there is an admittedly bona fide gift has no disqualifying equity in the leasehold is buttressed by my recollection that section 162(a)(3) itself requires only that the "use or possession" have a trade or business purpose. Coming full circle, it can be seen that such statutory language translates easily into the third *Mathews* requirement that only the leaseback (as opposed to the gift) must have a bona fide business purpose. I reject, as we did in *Lerner v. Commissioner, supra*, and in the majority opinion herein, the Fifth Circuit's requirement that the gift have a business purpose.

### Test 4.—The Grantor Must Not Possess a Disqualifying "Equity" in the Property Within the Meaning of Sec. 162(a)(3)

We can easily trace the origin of this part of the *Mathews* test. The statutory language of section 162(a)(3) requires that a lessee have no equity in the leased property if he is to be allowed to deduct the rentals he pays for the use of such property. Such restriction is spawned by the logical recognition that one cannot rent from himself. Thus, this arm of the *Mathews* test seems to involve only the simple question of whether the lessee owns the leasehold during the lease term.[4]

However, the grafting of a judicially originated doctrine onto the jurisprudence of gift-leaseback transactions has complicated the search for a disqualifying equity. Several courts early decided that a lack of apparent substance in the gift transfer would justify continuing to treat the donor of the transferred property as the true owner of the property. Having thus invested such donor with "real" title to the property, the courts then characterized such constructive ownership as an "equity" in the property. Therefore, the lessee, having been found to own an "equity" in the property, could not deduct the rentals paid to the trust. This is the technique discussed briefly in *Armston v. Commissioner*, *supra*. However, to fully understand the doctrine, we must trace it back to its origins.

The doctrine first surfaced in *Johnson v. Commissioner*, 86 F.2d 710 (2d Cir. 1936), affg. 33 B.T.A. 1003 (1936). In *Johnson v. Commissioner*, *supra*, the taxpayer borrowed money from a bank and gave the money to his wife. She then put the money into trust. The trustee was empowered to lend the money to the taxpayer. The taxpayer borrowed the money, signing an interest-bearing demand note which could not be called without the wife's consent, and immediately returned the funds to the bank, thus completing the round-trip of the funds. The taxpayer paid the periodic interest due on the "note," which amount the trustee invested in life insurance on the taxpayer's life. Thus, the circle was complete. The taxpayer had converted nondeductible payments for life insurance premiums into deductible

---

[4]A lessee's ownership of the reversion after the expiration of the lease term is not a disqualifying equity. *Mathews v. Commissioner*, 61 T.C. 12, 20 (1973).

interest payments. This farce was struck down by the court, not on the appropriate rationale that this device was a "sham transaction," but on the troubling rationale that, since the wife was under a "duty" to transfer the funds into trust and, therefore, did not have present control over the funds, the taxpayer had no intention of parting with the present interest and control over the funds. That being the case, the court deemed the taxpayer to have remained the "real" owner of the funds, which holding deprived him of the right to deduct interest paid for the use of the money. Thus arose the doctrine of treating the donor of property as the continuing owner of such property for purposes of disallowing manufactured interest deductions because of his continued control over such property.

In 1940, the famous case of *Helvering v. Clifford*, 309 U.S. 331 (1940), was decided. That case held that a donor who declared himself trustee of income-producing property which he placed into a 5-year reversionary trust for the benefit of his wife could be treated as the "real" owner of such property for purposes of deciding who was to be taxed on the income of the trust. The limited facts of the *Clifford* case should be noted. First, the case dealt only with the question of who should be taxed on the trust's income. Second, the property was to revert to the grantor at the end of the trust term. Finally, the trustee was not independent of the grantor. The difficulty in applying such a judicial doctrine was later recognized, and now, the whole area of income attribution of short-term trusts has been codified. Secs. 671–679.

The Tax Court, in two subsequent cases, made the judicial leap whereby the rationale of *Johnson v. Commissioner, supra,* and the limited holding of *Helvering v. Clifford, supra,* were meshed to form the doctrine with which we now are confronted, i.e., that a grantor of a trust over which he retains substantial control will be treated as the owner of the property in that trust, thereby giving him an "equity" in such property that will suffice to deny him any deductions for rentals paid for the use of such property. In *Skemp v. Commissioner*, 8 T.C. 415 (1947), revd. 168 F.2d 598 (7th Cir. 1948), and *Brown v. Commissioner*, 12 T.C. 1095 (1949), revd. 180 F.2d 926 (3d Cir. 1950), the taxpayer gave property to a trust which was to pay its income to specified family members for a term certain. Upon the termination of the trust, the property was to go to designated beneficiaries (not the

grantor). The taxpayers/grantors then leased the property back from the trustee, who was deemed to be independent. In both cases, the Tax Court denied the taxpayers' attempts to deduct the rentals paid, reasoning that since the leaseback was entered into simultaneously with the transfer of the property into trust, there was no passing of a present interest in the transferred property. The *Johnson* case was cited in both opinions as justification for such treatment. Both decisions were reversed by the appropriate courts of appeals. *Skemp v. Commissioner*, 168 F.2d 598 (7th Cir. 1948); *Brown v. Commissioner*, 180 F.2d 926 (3d Cir. 1950).

The Seventh Circuit upheld the form of the transaction, pointing out that the *Clifford* rationale does not apply in these cases. To the Commissioner's complaint that the situation giving rise to the deduction was caused voluntarily by the taxpayer, the court sagely replied, "while the taxpayer voluntarily created the situation which required the payments of rent, the fact remains that the situation created did require the payments. In this case we have a valid, irrevocable trust, wholly divesting the taxpayer of any interest in the trust property, and an agreement by the taxpayer to pay the trustee a reasonable rental under a valid lease." *Skemp v. Commissioner, supra* at 600.

Likewise, the court rejected the Commissioner's argument that there was no change in the taxpayer's economic status, stating, "Nor can we agree with the Commissioner that there was no change in the taxpayer's economic status. He had irrevocably divested himself of all title and right to the property and could occupy it only upon payment of rent." *Skemp v. Commissioner, supra* at 600.

The Third Circuit, in *Brown v. Commissioner, supra*, also upheld the bona fides of the transaction. Citing *Skemp*, it rejected the Commissioner's arguments in the same manner as did the court in *Skemp*. Furthermore, it found the fact that the rentals had been prearranged to be insignificant.

Into this judicial maelstrom also came the 1949 holding of this Court in *Armston v. Commissioner, supra*, which, as pointed out above, was a sale-leaseback case. In *Armston*, the transfer into trust (a purported sale) was disregarded for purposes of attributing to the donor/lessee a disqualifying equity in the property. This decision and the Tax Court's decision in *Brown v. Commissioner, supra*, were both accompanied by heavy dissents.

In 1963, this Court was again faced with the question of the deductibility of rentals in a gift-leaseback situation. *Van Zandt v. Commissioner*, 40 T.C. 824 (1963). However, that case was distinguishable from the *Skemp* and *Brown* cases in two important ways. First, the trustee in *Van Zandt* was the grantor, whereas the trustees in *Skemp* and *Brown* were independent. Second, the trust involved in *Van Zandt* was a 10-year *Clifford* trust, under the terms of which the property transferred to the trust would revert to the grantor after 10 years. In *Skemp* and *Brown*, the remainder interests in the trust property were transferred outright to the grantor's children. The Tax Court highlighted the fact that the trustees in *Skemp* and *Brown* had been independent, whereas the trustee in the case before it was not, and cited this independence as the determinative factor as to why the appellate courts in *Skemp* and *Brown* allowed the rental deductions sought in those cases. Then, the Court proceeded to cite *Johnson*, *Clifford*, and *Armston* and implicitly held that the transfer by gift had no economic reality. Therefore, under the old *Johnson* rationale, the Court apparently reasoned that the grantor/lessee had a disqualifying equity in the leased property and denied the deduction. This decision was affirmed by the Fifth Circuit in the above-discussed opinion wherein it announced its rule that the gift portion of the transaction, along with the leaseback, must have a business purpose. *Van Zandt v. Commissioner*, 341 F.2d 440 (5th Cir. 1965), cert. denied 382 U.S. 814 (1965).

With the Tax Court's decision in the *Van Zandt* case came a new emphasis on determining whether the trustee was independent of the grantor. As above stated, this emphasis arose from the implication by the Court in *Van Zandt* that the controlling distinction between *Skemp/Brown* and *Van Zandt* was the presence or absence of an independent trustee. The other distinction, which I think was very significant, was the fact that *Skemp* and *Brown* involved trusts where the grantor did not own the remainder interest in the trust, whereas *Van Zandt* involved a *Clifford* trust wherein the reversion was vested in the grantor. This second distinction has been largely ignored by the courts. However, this distinction was recently pointed out in *Goodman v. Commissioner*, 74 T.C. 684 (1980).

After the *Van Zandt* case, it was widely thought that a new requirement had been superimposed on the statutory language

of section 162(a)(3), i.e., that the trustee of the trust to which the property was transferred must be independent of the grantor. However, in 1968, the Tax Court presciently pointed out that the independence of the trustee is relevant only in the context of determining whether the taxpayer/grantor/lessee has retained a disqualifying equity in the leased property. *Penn v. Commissioner*, 51 T.C. 144 (1968). Accord, *Goodman v. Commissioner*, *supra*. There, we stated explicitly that the courts were using a *Clifford* -type rationale to determine who was the true owner of the transferred property for purposes of section 162(a)(3). With this revelation before us, we can see the relevance of the independent trustee. A trust that has a trustee who is independent of the grantor is distinguishable (as pointed out by the majority) from a reversionary *Clifford* trust, thus rendering the principles of that case inapposite. Thus, the existence of the independent trustee provides evidence that the gift transfer has substance since the grantor no longer has substantially the same control over the property that he had before.

The question that arises is this: Is the presence of an independent trustee necessary in every gift-leaseback transaction? If that factor were the only one that could take the transaction out of the teeth of the *Clifford* doctrine as it has been applied, the answer would be yes. However, the second distinguishing factor mentioned above should equally suffice to negate the applicability of the *Clifford* rationale, especially if it also accomplishes the goal of providing evidence that the gift transfer has substance in that the grantor no longer has substantially the same control over the property that he had before. That second distinction is the location of the reversion/remainder interest in the trust property. It would seem that the transfer by the grantor of the remainder interest in the property to someone other than himself should suffice to distinguish the transaction from the *Clifford* case and prove the bona fides of the transfer. Indeed, in *Penn v. Commissioner*, *supra*, we pointed out as significant the entrance of a "new independent owner" onto the scene in *Skemp* and *Brown*, though the reference in that opinion was to the independent trustee.

Significantly, the next major decision in this area of the tax law is a Ninth Circuit case, *Brooke v. United States*, 468 F.2d 1155 (9th Cir. 1972). Though I do not believe that any Ninth Circuit case is sufficiently on point to require application of the

*Golsen* rule, we should be sensitive to pronouncements from that circuit, inasmuch as this case would be appealable to that circuit. In *Brooke v. United States, supra,* the taxpayer gave the property upon which he conducted his medical practice outright to his minor children. He was then appointed as the guardian of the children and leased the property to himself at a reasonable rent. The Ninth Circuit upheld his deduction for the rentals paid. The court said, "The fundamental issue presented involves the sufficiency of the property interest transferred." *Brooke v. United States, supra* at 1157.[5] It concluded that the transfer was absolute. That being the case, the court easily distinguished it from the two cases urged by the Commissioner as controlling, *Helvering v. Clifford,* and *Van Zandt v. Commissioner, supra,* both of which involved reversion trusts. On the basis of the facts and the holding, one would think that the Ninth Circuit had embraced the principle that the absence of a reversion to the grantor suffices to validate the sufficiency of the property interest transferred, even in the absence of an independent trustee. However, the precedential value of the case, for that proposition, is weakened by a latter portion of the opinion. In a sentence that is pointedly noncommital concerning the necessity of an independent trustee, the court refers to that supposed requirement: "Many decisions pivot on the issue of the independence of the trustee." *Brooke v. United States, supra* at 1157. Having recognized that the presence of an independent trustee is often perceived as crucial, the court develops some independence for the grantor/guardian in *Brooke,* citing Montana's extensive court supervision over guardianships. The dissent in *Brooke* points out that the majority's opinion "adds further inconsistency to an area of tax law that is already fraught with too much semantical confusion." *Brooke v. United States, supra* at 1159 (Ely, *J.,* dissenting).

In 1973, the Tax Court faced this issue again in *Mathews v. Commissioner,* 61 T.C. 12 (1973), which involved a *Clifford* -type trust with a reversionary interest to the grantor and with an independent trustee. The grantor then leased back the transferred property at a reasonable rent. The Court allowed his sought rental deduction. As discussed above, it was in *Mathews*

---

[5] Judge Wilbur's dissent conveniently overlooks this critical statement of the fundamental issue in *Brooke v. United States, supra,* in his analysis thereof.

*v. Commissioner, supra,* that the four tests which we are examining were synthesized and stated. I have alluded to and examined the second, third, and fourth tests (as numbered in *Lerner v. Commissioner,* 71 T.C. 290 (1978)) and have found that they all have their origin in the statutory language of section 162(a)(3). I further hinted that the statutory origin of the first requirement is not so clear. The first prong of the *Mathews* test states that "The grantor must not retain substantially the same control over the property that he had before he made the gift." *Mathews v. Commissioner, supra* at 18. The Court cited *Penn v. Commissioner, supra,* as the precedent for that statement. However, I previously noted that *Penn* clarified the fact that all of the *Clifford, Johnson,* and *Armston* considerations were relevant only in determining whether the taxpayer had a disqualifying equity in the rented property under section 162(a)(3). Thus, this first prong of the *Mathews* test should not be considered as an independent test, but rather as a factor to be considered under the fourth prong of the *Mathews* test, i.e., whether the grantor has a disqualifying equity in the rented property within the meaning of section 162(a)(3). That this assessment of the function of this first prong of the *Mathews* test is correct is evidenced by the fact that this portion of the test has often been cited as the prong requiring an independent trustee. *Mathews v. Commissioner, supra* at 18; *Lerner v. Commissioner, supra* at 302. As with the independent trustee requirement to which it has been equated, the requirement of a substantial change in the grantor's control over the property is relevant only in the search for a disqualifying equity.

Returning to the holding in *Mathews,* we can see that the existence of an independent trustee provided sufficient distinction from the *Clifford* doctrine and sufficient substance to the transfer to enable the Court there to uphold the bona fides of the gift transfer. As we have seen, once that is accomplished, the rental deductions will invariably be allowed, absent an unreasonable rental figure.

The Court in *Mathews* did not mention the possibility that the location of the reversion/remainder interest in the property might provide another ground upon which to distinguish the fact situation there in issue from the *Clifford* case or provide another proof of the bona fides of the transfer. One might think that this possible argument was neglected because *Mathews* involved a

reversionary, *Clifford* trust, thereby mooting the argument. However, on May 23 of the last taxable year in issue in *Mathews*, the taxpayers/grantors/lessees, who were calendar year taxpayers, transferred their reversionary interests to an irrevocable trust for the benefit of their children. Since the Government did not challenge the deductibility of the rentals paid after the relinquishment of the reversion, the Court discreetly avoided mentioning the possible significance of this transfer in its opinion. On appeal, the Fifth Circuit (which reversed the Tax Court based on the *Van Zandt v. Commissioner, supra,* requirement that the gift have a business purpose) pointed out the possible significance of the location of the reversion. *Mathews v. Commissioner,* 520 F.2d 323, 324 n. 6 (5th Cir. 1975). The court, in the same footnote, distinguished its holding in *Mathews* from the holding in *Brooke v. United States, supra,* on the basis of the *location of the reversionary interest* and pointed out that the Government did not challenge the arrangement in *Mathews* after relinquishment of the reversion.

Other than *Butler v. Commissioner,* 65 T.C. 327 (1975), in which the rental deduction was denied solely because the *Golsen* rule required our adherence to the business-purpose test of the Fifth Circuit, and *Perry v. United States,* 520 F.2d 235 (4th Cir. 1975), revg. 376 F. Supp. 15 (E.D. N.C. 1974), cert. denied 423 U.S. 1052 (1976), in which the Fourth Circuit seems to have adopted the same test, there were no significant post-*Mathews* cases in the gift-leaseback area until our 1978 decision in *Lerner v. Commissioner,* 71 T.C. 290 (1978).

In *Lerner v. Commissioner, supra,* the gift transfer was made to a reversionary *Clifford* trust with an independent trustee. The transaction was slightly different from the normal gift-leaseback transaction in that the lessee was the grantor's wholly owned professional corporation, instead of the grantor himself. In granting the corporation the deduction, we there emphasized that the statutory language of section 162(a)(3) is the sole standard by which to judge the availability of the rental deduction. The significance of a grantor's irrevocable relinquishment of the reversion/remainder interest in the property was again not before the Court in *Lerner v. Commissioner, supra.*

Turning to the facts before us, I see a gift-leaseback transaction that resembles *Skemp, Brown,* and *Brooke,* more than it does *Van Zandt, Mathews,* or *Lerner,* because the reversionary

interest in the case before us has been irrevocably transferred away from the grantor/lessee, Dr. May. The *Clifford* doctrine, which was never intended to deal with gift-leaseback questions in the first place, is clearly inapplicable here because it applies only to reversionary trusts. Furthermore, the transfer of the reversionary interest supplies adequate substance to the transfer. The Fifth Circuit, in *Mathews v. Commissioner, supra*, graphically described the need for substance in tax transactions:

> In deciding the federal questions of income tax law, we must examine transactions with substance rather than form in mind. If we stood at the top of the world and looked down on this transaction—ignoring the flyspeck of legal title under state law—we would see the same state of affairs the day after the trust was created that we saw the day before. [*Mathews v. Commissioner*, 520 F.2d 323, 325 (5th Cir. 1975).]

Where a grantor transfers ownership of property for a limited time to a non-independent trustee, thereby retaining perpetual control and eventual ownership of the property, the transfer is without substance, and he has retained a disqualifying equity in the property.[6] However, where the existence of an independent trustee removes the property from the grantor's perpetual control, or where the transfer of a reversion removes the property from his eventual ownership, the transfer of the property has substance, and the gift has effectively placed the "real" ownership into a "new, independent owner." *Penn v. Commissioner, supra* at 154. Since, in the latter situation, the grantor will not be deemed to be the owner of the property transferred, he will not own, either legally or constructively, a disqualifying equity in the property. If the ensuing lease has a business purpose, and the rentals agreed to thereunder are "required," such rentals should be deductible under the plain language of section 162(a)(3).[7]

---

[6]Realistically, such a situation, where the trustee controls property which he will eventually own outright, approaches a merger of estates. Restrained only by the beneficial income interests of beneficiaries who are usually his minor children, such a trustee has the power and, especially, has the motive to deal with the property in such a way as to benefit the remainderman, himself, at the expense of the income beneficiaries. He would have an increased motivation to reclassify income as corpus, where he was so empowered to do so, and thereby benefit himself upon the trust's termination.

[7]As an aside, I would note that Judge Simpson's conclusion that the trust did not own the trust property until Sept. 20, 1973, simply is not supported by the controlling law or the evidence. The crux of Judge Simpson's dissent on this matter is that, in order to effectuate a present transfer of property in California, the property must be transferred in a writing

However, it is at this point that the analytical error undergirding the majority and dissenting opinions surfaces. The majority takes this first prong of the *Mathews* test, elevates it to an independent test (though it has relevance only in the search for a disqualifying equity), equates it with a need for an independent trustee, and then finds that the trustee is independent. Although the majority's subsequent statements concerning the need for independent trustees in this factual context casts welcome doubt on the way in which this prong of the *Mathews* test has been utilized, I cannot ignore the fact that the majority's finding regarding the independence of the trustees implies that such a finding was necessary. Similarly, the dissenters deem the independence of the trustees to be an absolute prerequisite to the allowance of the rental deduction here sought. Both positions

---

executed by the transferor which evidences an intent to transfer the property (Cal. Civ. Code Ann. sec. 1091 (West 1954)), but that the declaration of trust, which petitioners contend meets those requirements, evidences no such intent. Respondent contends, and Judge Simpson agrees, that the following language from the trust declaration is evidence that it was not the instrument by which petitioners intended to transfer their title to the trust property to the cotrustees: "The Trustors have delivered to Trustees, without any consideration on their part, all their right, title and interest in and to the [trust] property."

The contention is that, by using the phrase "have delivered" in their trust declaration, petitioners displayed their belief that a document other than the trust declaration had been used to transfer the property to the cotrustees; therefor, argues respondent, petitioners could not have intended that the trust declaration be the conveyancing instrument. However, such verbal nitpicking will not prevent an instrument which shows a clear intent to presently convey an interest in property from doing so. *Keogh v. Noble*, 136 Cal. 153, 68 P. 579 (Cal. 1902); *Del Giorgio v. Powers*, 27 Cal. App. 2d 668, 81 P.2d 1006 (1938). The trust instrument before us clearly evidences the petitioners' intention to convey, on Jan. 15, 1971, all of their right, title, and interest in the property transferred, such intention being shown by the following provisions in the trust instrument:

"Section 2.2 By this instrument Trustors, and each of them, relinquish, absolutely and forever, all their possession of, or enjoyment of, or right to income from, the trust property.

\*          \*          \*          \*          \*          \*          \*

"Section 2.4 Trustors, and each of them, expressly renounce for themselves, and for their states, any and all interest, either vested or contingent, including any reversionary interests or possibility of reverter, in the income or corpus of the Trusts."

Judge Simpson's citation of two "contract for sale" cases (*In re Goetz's Estate*, 13 Cal. App. 198, 109 P. 145 (1910), and *Roberts v. Abbott*, 48 Cal. App. 779, 192 P. 345 (1920)) in support of his position is hardly persuasive. Contracts for sale are, by definition, promises to convey at a future date. Such instruments are hardly analogous to a trust instrument which contains such clear indications of intent to make a present conveyance as does the one before us. Of course, most importantly, it is clear that the question of intent is a question of fact (*Follmer v. Rohrer*, 158 Cal. 755, 112 P. 544 (Cal. 1910); *Kelly v. Bank of America National Trust & Savings Assn.*, 112 Cal. App. 2d 388, 246 P.2d 92 (1952)), and the holding of the majority on this issue necessarily constitutes a finding of fact that the requisite intent was evidenced in the trust declaration. I defer to and accept that finding and, therefore, believe that the property was transferred in toto to the trust prior to 1973.

ignore the basic facts that: (1) The requirement of an independent trustee is not in the controlling statute; (2) the independent trustee requirement arose only in factual situations that are analogous to *Clifford* trust situations and, there, only to ensure that the "real ownership" of the transferred property no longer remained in the hands of the grantor/lessee; and (3) the present situation, where the grantor has transferred not only the term interest but also the reversion/remainder, is not analogous to the *Clifford* trust situations and, therefore, does not need the extra validation of the transfer that is provided in the *Clifford* trust situation by the existence of an independent trustee.

Since I would decide that petitioners' irrevocable transfer to their children of the remainder interest in the property provides sufficient substance to validate the gift transfer, the independence of the trustees would possibly be relevant only in the context of determining whether the agreed-upon rental was "required." Normally, we would be forced to decide if the trustees were independent enough of Dr. May to bargain at arm's length over the appropriate rental figure of the leased property. If we were to deem the parties to be sufficiently independent of each other, then the rental agreed upon by the parties to the lease would be per se "required." If they were not deemed to be sufficiently independent of each other to ensure arm's-length bargaining, we would, under the holding of *Sparks Nugget, Inc. v. Commissioner*, 458 F.2d 631 (9th Cir. 1972), cert. denied 410 U.S. 928 (1973), be forced to determine whether the agreed-upon rental was reasonable and, therefore, "required" under section 162(a)(3). However, we need not decide whether the trustees were independent of Dr. May because the parties to this controversy stipulated that the rentals paid were reasonable. Such stipulation conclusively characterizes the rentals as "required," as that term is used in section 162(a)(3).

The general rules for the deduction of rentals paid are found in section 162(a)(3). *Quinlivan v. Commissioner*, 599 F.2d 269 (8th Cir. 1979), cert. denied 444 U.S. 996 (1979). The *Mathews* tests, as clarified in this concurrence, can assist the courts in determining whether those statutory requirements for the deduction of rentals paid have been met. However, the approach implicit in the majority opinion and explicit in the opinion of the dissenters requires us to make a finding concerning the trustees' independence even where, as here, such independence is irrele-

vant to the search for a disqualifying equity. When the issue before us is the reasonableness of rentals charged and paid by related parties, we will always be forced to determine the independence of the parties in order to determine whether the rent was "required," as that term is used in section 162(a)(3). But, when the reasonableness of the rent is not at issue, and where the transfer of the reversion/remainder ensures that the grantor has no disqualifying equity in the leased property, we should not add the independent trustee test to the list of requirements that the lessee must meet in order to deduct the rentals paid or incurred. To do so adds a factual question soluble only by the courts, and attempts by the parties involved (taxpayers and the Treasury) to get a judicial resolution of this issue only exacerbates our already burgeoning caseload.

Furthermore, it is questionable whether we can provide any consistent, concrete guidelines to explain the quantum and quality of independence needed in these kinds of cases. Even here, the majority finds the trustees to be so independent that it need not pass on the necessity for such independence; while Judge Wilbur, at two different places in his dissent, has this to say about the independence of the trustees:

His [Mr. Gross'] performance was not independent by any stretch of the imagination.

*　　*　　*　　*　　*　　*　　*

How the majority can conclude that he was an independent trustee is beyond me.

Though I am inclined to agree with the majority on this issue, the important point is that we need not decide it under these facts. If we insist on inviting litigation over this issue, the embarrassing inconsistencies which will surely follow are the deserved fruits of our folly.

IRWIN and WILES, *JJ.*, agree with this concurring opinion.

SIMPSON, *J.*, dissenting: I subscribe to the views forcefully set forth by Judge Wilbur, but I should like to add the following comments. In its approach, the majority has lost sight of the purpose of the criteria established by *Mathews*. In a gift-leaseback transaction, there is a serious question as to whether the transfer has sufficient economic reality for it to be recog-

nized for Federal tax purposes. After reviewing and analyzing the other decisions in this area, the *Mathews* criteria were developed to provide a rational basis for resolving such cases. Their ultimate objective is to decide whether the transaction has economic reality, and to do so, it is necessary to decide whether the donor has, in fact, parted with the control of the property. Thus, although a lease need not be in writing for some purposes, it is important that the lease be written in a gift-leaseback situation so that we know the terms of the lease and can judge whether the donor has really parted with control of the property. Similarly, although the imposition of fiduciary obligations on a person may be sufficient to cause him to be recognized as a trustee for some purposes, it is important that the trustee be wholly independent of the donor for purposes of judging the control relinquished by the donor. When the purpose of the *Mathews* criteria is kept in mind, it is clear that the lack of a written lease in this situation was very material and that Mr. Gross was not the type of independent trustee who would assure that the trust and lessee dealt with each other at arm's length.

In addition, under California law, the trust was not created before September 20, 1973, because it did not become the legal owner of the medical property before that date. In the first place, the deed purporting to transfer the property bears a date of execution of September 20, 1973. Strong proof is required to contradict the terms of a written instrument (*Lucas v. Commissioner*, 58 T.C. 1022 (1972)), and the record contains no such proof showing an earlier execution date. Second, the California courts would not find, as does the majority, that the trust instrument itself conveyed the property. Under California law, real property can be transferred only by a written instrument executed by the transferor. Cal. Civ. Code Ann. sec. 1091 (West 1954). To transfer property, a writing must reveal an intent to do so. *Olson v. Cornwell*, 134 Cal. App. 419, 25 P.2d 879 (1933); *Roberts v. Abbott*, 48 Cal. App. 779, 192 P. 345 (1920). Here, when the trust instrument was prepared by the petitioners' attorney, a deed of the medical property was also prepared. The trust instrument stated that the petitioners "have delivered" such property to the trustees. That language indicates that the trustors believed that the property had been conveyed by some other instrument, and the simultaneous preparation of the deed

reinforces that interpretation of the language of the trust instrument.

Two California cases, *In re Goetz's Estate*, 13 Cal. App. 198, 109 P. 145 (1910), and *Roberts v. Abbott, supra,* are analogous to this case. In each of those cases, there was a written contract for the transfer of real property. However, in each case, the contract also indicated that title was to be passed by another instrument. Principally because of the reference to another instrument of transfer, each court held that the contract did not effect a conveyance but was merely an agreement to convey. Similarly, the trust instrument in this case fully set forth the agreement between the settlors, Dr. and Mrs. May, and the trustees, Dr. May and Mr. Gross, with respect to the medical property, but the instrument itself clearly manifested an intent that the property be conveyed by the deed. In my opinion, therefore, it cannot be said that the trust instrument conveyed the medical property.

The majority cites three California cases to support its conclusion. *Olson v. Cornwell, supra*; *Keogh v. Noble*, 136 Cal. 153, 68 P. 579 (1902); *Weiner v. Mullaney*, 59 Cal. App. 2d 620, 140 P.2d 704 (1943). *Olson v. Cornwell* is authority for nothing more than the proposition that an instrument conveys property if it manifests an intent to do so. The instrument involved in that case showed such an intent, but was inartfully drafted. The court held that "inaccuracy of expression or * * * ineptness of the words used" did not prevent the instrument from effecting a conveyance. *Keogh v. Noble* did not involve the question of when an instrument conveys property. There, it was clear that a transfer had been made, and the only issue was whether the transferee owned the property outright or as trustee for the benefit of the transferor. *Weiner v. Mullaney* also did not involve the issue of transfer. In that case, a brother had written a series of letters to his sister indicating that he was holding property for her benefit. The court found that the letters manifested an intent to create a trust for the sister and that therefore the sister was entitled to income realized upon the sale of the property held by the brother.

I recognize, as does the Commissioner in his brief, that if Dr. May alone had been appointed as a trustee, the mere written declaration by Dr. and Mrs. May that Dr. May was holding the medical property in trust would have created a valid, funded trust since there would have been no need for a transfer of the

property to a third party. See *Weiner v. Mullaney, supra.* However, Mr. Gross was also appointed as a trustee, and therefore, it was necessary that there be a conveyance to him. It is sufficiently clear to me that there was no such conveyance before September 20, 1973.

WILBUR and PARKER, *JJ.*, agree with this dissent.

WILBUR, *J*, dissenting: I respectfully dissent. This opinion will muddy waters clarified over a long period of time. Indeed, the Eighth Circuit recently noted that "the Tax Court has taken the lead in developing a consistent body of law in this area." *Quinlivan v. Commissioner*, 599 F.2d 269, 273 (8th Cir. 1979), affg. a Memorandum Opinion of this Court, cert. denied 444 U.S. 996 (1979). The court specifically referred to the four criteria we articulated in *Mathews v. Commissioner*, 61 T.C. 12 (1973), revd. 520 F.2d 323 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). Only two of the requirements are relevant to this case: that the leaseback must normally be in writing and require payment of reasonable rent; and that the grantor must not retain substantially the same control over the property before and after the gift.

### I. *The Leaseback Should Normally Be in Writing and Must Require Payment of a Reasonable Rental*

*Mathews* requires that there *normally* be a written lease. The reason for this is obvious. When pursuant to an arm's-length transaction a business lease is entered into, prudent men and independent trustees normally insist that the terms agreed upon be reduced to writing. The terms of the lease, the amount of the rent, the circumstances under which rent may be increased, the responsibilities of lessors and lessees, the circumstances of a potential breach, the rights of the parties in case of a breach, the responsibilities for maintenance, repair, insurance, taxes, and other factors are sufficiently complex and the legal consequences important enough to be reduced to writing. Indeed, as noted later, the California Statute of Frauds requires that a lease for a period longer than 1 year be in writing in order to be valid.

In the instant case, we have a business lease, and the parties

apparently intended it to be for 10 years. Both the business exigencies and prudent procedures, as well as the California Statute of Frauds, mandate that the lease be in writing.[1] *Mathews* requires that the lease normally be in writing. This is a separate and distinct requirement that has not been complied with in the instant case.

## II. *The Grantor Must Not Retain "Substantially the Same Control Over the Property That He Had Before" He Made the Gift*

The control requirement simply ensures that the property given away is used for the benefit of the donees, in the same way that it would be if the donee and the donor were unrelated parties. The control requirement, the majority tells us, has "caused courts to consider the independence of the trustee in a gift leaseback situation." Indeed, in *Brook v. United States*, 468 F.2d 1155 (9th Cir. 1972), affg. 300 F. Supp. 465 (D. Mont. 1969), the Ninth Circuit (to which this case is appealable) noted that, "in analyzing gift and leaseback cases" one of the factors that must be considered is "the independence of the trustee." *Brook v. United States, supra* at 1157. The court went on to state that:

> Many decisions pivot on the issue of the independence of the trustee. See, Van Zandt v. Commissioner of Internal Revenue, 341 F.2d 440 (5th Cir. 1965); Brown v. Commissioner of Internal Revenue, 180 F.2d 926 (3d Cir. 1950); Ingle Coal Corp. v. Commissioner of Internal Revenue, 174 F.2d 569 (7th Cir. 1949); Skemp v. Commissioner of Internal Revenue, 168 F.2d 598 (7th Cir. 1948); Penn v. C.I.R., 51 T.C. 144 (1968); Alden B. Oakes, 44 T.C. 524 (1965); Albert T. Felix, 21 T.C. 794 (1954). * * * [*Brooke v. United States*, 468 F.2d at 1157.][2]

Mr. Gross, the cotrustee herein, was Dr. May's patient, friend, and grocer. His performance was not independent by any stretch of the imagination. The only asset of the trust was Dr. May's medical building, and the deed transferring the property was not acknowledged and recorded until sometime late in 1973—3 years after the trust was established. The deed bears an execution date of 20 September 1973, but the majority notes that "the

---

[1]See Cal. Civ. Code sec. 1624 (West 1973).

[2]The court noted that the necessary independence was achieved in the guardianship under Montana law, saying it was administered with the same independence as any court-administered trust. Although the facts are entirely different from those before us, the court recognized the need for an independent trustee.

original execution date on the deed has been erased." Who did the erasing and for what reason is not known. But we do know Mr. Gross remained comfortably unaware of these matters for 3 years.

Additionally, rental income from the office building was the only anticipated source of trust income during the early years of the trust. Mr. Gross should have been interested in seeing that the property was leased on a business-like basis, for the lease was the critical business transaction of the trust. Yet the majority tells us that, "Mr. Gross assumed that there was an executed lease and that title to the property had been transferred to the trust, but he made no *independent* investigation to determine whether a lease had been executed and the transfer completed." (Emphasis added.) But aside from any "independent investigation" that an independent trustee would normally make, Mr. Gross knew he had never cosigned a lease of any kind. That alone would belie any notion that Mr. Gross was an independent trustee.

Mr. Gross, as evidenced by his responses to the following questions, actually had little interest in the lease:

Q. Have you ever discussed with Dr. May the fact that you ought to re-examine that rent, or whether the rental rate is correct, or should be increased, decreased, or anything concerning the rent?

A. No.

Q. Is there any reason that you have not seen fit to discuss that?

A. I was under the impression that the lease would have been drawn for 10 years, when the trust was drawn. Now, I never saw the lease. I was just under the impression that it would be drawn. That was what we talked about, that the lease would be drawn, and I'm sorry, I have no recollection of anything else.

The majority tells us that Mr. Gross "felt independent" and testified that "he was aware of the fiduciary nature of his position." More than sensation and cognition are required, for as the majority also tells us, "Mr. Gross had served as a trustee for other trusts." He was also an experienced and successful businessman with 20 employees. In this instance, he simply treated the whole affair as the personal, financial, and family business of Dr. May. How the majority can conclude that he was an independent trustee is beyond me.

### III. *Discussion of Independent Trustee is Confusing*

At one point, the majority states:

The remaining prong of the *Mathews* test—that the grantor must not retain substantially the same control over the property that he had before he made the gift—has also caused courts to consider the independence of the trustee in a gift-leaseback situation. As the Ninth Circuit stated: "Many decisions pivot on the issue of the independence of the trustee." *Brooke v. United States*, 468 F.2d at 1157.

Yet at another point, the majority tells us:

we need not decide whether an independent trustee is required in every gift leaseback case, for we are satisfied that Mr. Gross is sufficiently independent to meet the tests of *Mathews*: the rent paid under the lease was reasonable, the leaseback had a bona fide business purpose, the grantors did not possess a disqualifying equity in the property, and the grantors' control over the property was not substantially the same control possessed before the gift.

In one breath, we are told that the requirement of an independent trustee originates in the prong of the *Mathews* test precluding the grantor from retaining substantially the same control over the property before and after the gift; in the next breath, we are told that the trustee is "sufficiently independent" to meet the *Mathews* test because (in this order) rent paid was reasonable, the leaseback had a business purpose, the grantor did not possess a disqualifying equity in the property, and finally, the grantor did not possess the same control before and after the gift.

Under the majority's *own* opinion, the last of these four criteria is the one directly related to the issue of the trustee's independence. To parade out the other independent *Mathews* criteria (i.e., that the grantor does not possess the disqualifying equity in the property) and to omit the most significant (that the lease be in writing) merely diverts attention from the *Mathews* criteria in issue)—the control of Dr. May before and after the gift. The bare assertion that Dr. May's control was substantially altered by the gift cannot withstand analysis. On the record before us, he simply performed a paper shuffle and continued to call the tune.

### IV. *Reasonableness of Rent*

The lease must normally be in writing "*and* require payment of a reasonable rental." The majority states that the "require-

ment of a reasonable rental finds its roots in the statutory mandate that the rent be 'required.' " See sec. 162(a)(3). The rent must correspond to the reasonable rental value of the property: anything less is siphoning off money from the trust; anything more simply demonstrates that the transaction is nothing but a convenient mechanism for the assignment of income.

The parties entered into the following stipulation:

> During the years 1971, 1972 and 1973, Dr. May paid a $1,000.00 monthly rental for the use of the medical building. This amount of rent is deemed to have been reasonable in the year 1973.

This does *not* state that the rental was reasonable over the entire 10-year period apparently intended, and respondent is bound by no such stipulation. And indeed, it was not. The property was valued at approximately $45,000, and the rental was $12,000 per year—on a *net* basis. The entire capital of the trust would have been recovered, net of any expenses, in from 3 to 4 years on the basis of Dr. May's payment alone. And there is more, since there was also an additional $100-per-month rental from another tenant.

The rent was in fact outrageously high, most of it simply being a gift of Dr. May's income, demonstrating clearly what the transaction was: a mechanism where Dr. May would retain control of the property and assign substantial income to his children. It seems very late in the day to sanction this kind of transaction.[3]

## V. *Conclusion*

As noted earlier, other courts have recognized that "the Tax Court has taken the lead in developing a consistent body of law in this area." This case is entirely inconsistent with that body of law and misstates the applicable criteria. It will unsettle a settled area of the law, producing confusion out of order.

We should remember that lawyers have to advise clients in these difficult areas. Reasonably consistent and settled rules provide predictability and permit planning without undue fear

---

[3]The oral lease was apparently for 10 years. In spite of respondent's stipulation as to 1973, the negotiation of a lease without regard to the fair rental value of the property *over the 10-year period of the lease* (except for 1973) demonstrates this was a solo operation established and run out of Dr. May's hip pocket.

that respondent, the ubiquitous silent partner in all these transactions, will appear on the scene years later to claim a larger share. In this case, the taxpayer wins, but the social and individual costs of future unnecessary litigation surely flowing from this decision are far too great a price to pay for the compelling equities the majority apparently sees.

SIMPSON and PARKER, *JJ.*, agree with this dissent.

CHABOT, *J.*, dissenting: It may be that, as suggested in Judge Goffe's concurring opinion, there is no need for an "independent" trustee in the instant case. But the opinion of the Court, and a majority of the Judges of the Court, are unwilling to dispense with the requirement of an independent trustee.

Presumably, the independent trustee is to serve as some additional guarantor that the transaction resulted in a real change in control over the property. In some manner, the independent trustee is thought to be necessary, notwithstanding the existence of the grantor trustee and (at least some of) the formal paperwork. Presumably, the fiduciary obligations imposed on the grantor trustee are not, by themselves, thought to be sufficient to establish the reality of a change of control. If the independent trustee is to serve some additional function in the analysis of the situation, it would appear that this function must inhere in the concept of "independence." On the basis of the record herein, I do not see that the supposedly independent trustee demonstrated any independence. If all that is required is that the trustee be in existence, with formal fiduciary obligations, then I submit that the opinion of the Court establishes a requirement which can so easily be met in form (though not in substance) that no purpose in the real world is served by the creation of the role of independent trustee.

Since the opinion of the Court and the majority of the judges are unwilling to agree that the independent trustee is essentially a matter of form that may be dispensed with in the interests of efficiency, and since it is evident that the independence of Mr. Gross was only a matter of form, I conclude that petitioners have failed to satisfy the Court-imposed requirement of showing that there was an independent trustee. Consequently, I respectfully dissent.