Thomas A. EVANS and Deborah Evans, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Richard V. EVANS, Jr. and Joyce Evans, Plaintiffs,

v.

UNITED STATES of America, Defendant.

R.V. EVANS COMPANY DISTRIBUTORS, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. 81–3273 to 81–3275.

United States District Court, C.D. Illinois, Springfield Division.

Aug. 17, 1983.

James O. Beavers, Hershey, Bliss, Beavers, Periard & Romano, Taylorville, Ill., for plaintiffs.

Gerald D. Fines, U.S. Atty., Richard N. Cox, Asst. U.S. Atty., C.D. Ill., Springfield, Ill., James K. Wilkens, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## ORDER

J. WALDO ACKERMAN, Chief Judge.

A bench trial was held in this case on February 22, 1983. The following opinion contains my findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

This is a consolidation of three federal tax refund suits wherein the plaintiffs seek to invalidate a determination by the Internal Revenue Service (IRS) that certain transactions between R.V. Evans Company (hereinafter referred to as the Company) and the Evans Irrevocable Trust No. 2565 were shams and invalid for federal tax purposes. Alternatively, defendant relies on Section 482 of the Internal Revenue Code to support the reallocation of income and deductions between the plaintiffs and the Evans Trust. Plaintiffs Thomas A. Evans and

Deborah Evans seek a refund of $17,118.87 in income taxes plus interest assessed against and collected from them for tax years 1977 and 1978. Plaintiffs Richard V. Evans and Joyce A. Evans seek a refund of $17,199.61 in income taxes plus interest assessed against and collected from them for tax years 1977 and 1978. Plaintiff R.V. Evans Company seeks a refund of $18,-543.01 in income taxes, plus interest, assessed against and collected from it for its taxable years ended June 30, 1977, June 30, 1978, and June 30, 1979. The refunds sought result from the government's disallowance of amounts claimed as corporate rental expense deductions and taxation thereof to the shareholders as constructive dividends.

R.V. Evans Company Distributors was incorporated in 1970 and is an industrial supplier of fastening equipment to the construction industry. Richard V. Evans, Jr. and Thomas A. Evans are brothers who own all of the stock of R.V. Evans Company. In October of 1975, Paslode Company, a cherished customer, terminated its franchise agreement with R.V. Evans Company. The business generated by the Paslode account amounted to approximately sixty percent of the net profits of R.V. Evans Company. The franchise was terminated because of the poor performance of R.V. Evans Company in promoting and selling Paslode Company products. Without an alternative source of inventory available, R.V. Evans Company's future appeared bleak. Following negotiations and promises to improve sales, Paslode reinstated the franchise agreement.

During this period, Richard Evans implemented several changes with the hope of improving corporate operations. Overdue accounts were collected and early payment of current accounts was encouraged. Purchase discounts were taken, operating costs were cut, inventory was revitalized and sales efforts intensified. The Company acquired a bookkeeping computer to increase efficiency. The Company desired to sell its capital equipment, which at that time included five Ford station wagons, a computer, one van and one Cadillac, in order to improve liquidity.

Early in 1976, Richard discussed with Thomas and their accountant the advantages of selling the Company's capital equipment and leasing such equipment instead. They considered leasing automobiles from one company and a computer and other equipment from another company. However, in order to minimize paper work and have only one entity responsible for the leasing details, they decided that a centralized leasing arrangement would be most appropriate. Thomas and Richard decided to establish a trust with a bank in order to be able to centralize the leasing operation and to improve the Company's liquidity. Richard Evans testified that simply borrowing money from a bank would impair the Company's financial statement, when the Evans brothers' goal was to improve the finances of the corporation.

On October 31, 1976, Richard and Thomas Evans established Irrevocable Trust No. 2565, naming their children as beneficiaries. The purpose of the trust was to benefit their children and to create an entity which could acquire and lease equipment to the Company. The Millikin National Bank of Decatur was named as Trustee.

The terms of the trust provided for equal payments of one-half the net trust income to the children of Richard Evans and equal payments of one-half the net trust income to Thomas' children, at least annually. As each child attains age twenty-one, the child is to receive a proportionate share of trust principal, distributed free of trust. That child's interest in the trust terminates at that point. No reversionary interest was retained by the Grantors.

Under the terms of the trust, the Trustee is empowered "to sell, exchange, assign, convey, mortgage, lease," etc., the trust estate, "according to terms and conditions as Trustee shall independently decide and determine. . . ." The Trustee was further authorized to purchase, as investments for the trust, any real estate or personal property belonging to the Grantors. The terms of

any such purchase were to be independently determined by the Trustee.

At the time the Trust Agreement was executed, the sale and leaseback, though contemplated, had not yet been arranged.

Roger Beaman, a trust officer of Millikin National Bank since 1974, testified that the terms of the trust were to be followed as written, that the Bank's lawyers examined the trust and recommended two changes which were incorporated, and that this trust was handled like any other trust administered by the bank.

In November of 1976, R.V. Evans Company sold to the Trust five 1974 Ford station wagons, one 1976 Cadillac, a 1969 Ford van, and computer equipment for about $34,000. Vernon Mercier, an assistant trust officer at Millikin National, was assigned by his supervisor, Roger Beaman, to handle the Evans Trust. He was to complete the purchase of the property from the Company, then trade in the vehicles for new and lease those to the Company. The Trustee borrowed about $75,000 from the Bank's commercial loan department in order to purchase the equipment from the Company and the new vehicles. Mercier received a bill of sale for the equipment and titles for the vehicles, and he also signed the purchase invoices for the new vehicles. The commercial loan department determined the rate and duration of the note. The note was to be repaid in thirty-six monthly installments at an interest rate which could fluctuate between seven and nine percent. Payments for principal and interest were to be $2,135.79 per month. The Trustee executed a security agreement and lease assignment in order to secure the loan.

The equipment lease agreement for the new vehicles and computer equipment was executed on November 30, 1976. The duration of the lease was thirty-six months, with monthly payments set at $2,662.50. The amount of rental was determined by the Trustee by reference to a schedule used by the Bank for such matters. Neither Richard nor Thomas Evans had any input in determining the amount or duration of the lease.

Several other purchase and leaseback arrangements transpired, with the Trustee arranging the financing and setting the rental terms. Mercier testified that he considered each transaction independently, that neither Richard nor Thomas controlled or influenced him in any manner, and that these were typical lease arrangements.

The Government did not present a witness in the case. It did not even attempt to prove that the purchase price of the vehicles and equipment was unreasonable. Nor did the Government attempt to show that the rental amounts charged by the Trust were in any way unreasonable or disproportionate. Moreover, the Government concedes that this was a valid trust for state law purposes. Nevertheless, the IRS determined that the transactions between the Trust and the Company were shams and invalid for federal tax purposes. The Government contends that the Trust was created solely to manufacture artificial rental deductions and to unlawfully assign income from the Grantors to their children. The IRS disallowed the rental deductions taken by the corporate taxpayer and treated the transaction as a financing agreement between the Evans Company and the Millikin Bank. Evans Company was allowed additional depreciation deductions, gains on the sales of the assets to the Evans Trust originally reported on the Evans Company's tax return were eliminated, and the Evans Company was allowed a deduction for interest paid to the Millikin Bank. The IRS included in the individual shareholders' income the amount paid by the Evans Company to the Trust, concluding that such payments were constructive dividends made for the benefit of the individual taxpayers.

The Government contends that before a taxpayer will be allowed tax benefits from a sale and leaseback of property from a trust, the taxpayer must show that the trust had "economic reality". Economic reality requires, according to the Government, the following:

1. That there is an "arms-length" relationship between the parties involved;

2. That the grantors retained no substantive control over the operation of the trust;

3. That the trust was operated by an independent trustee; and

4. That there was a genuine business purpose of the trust.

In a recent gift-leaseback case, *Rosenfeld v. Commissioner,* 706 F.2d 1277, 1280 (2d Cir.1983), the court adopted the following as the test for determining the validity of the claimed rental deductions:

1. The grantor must not retain substantially the same control over the property that he had before he made the gift;

2. The leaseback should normally be in writing and must require the payment of a reasonable rent;

3. The leaseback must have a bona fide business purpose; and

4. The grantor must not possess a disqualifying 'equity' in the property within the meaning of section 162(a)(3).

This test was adopted from the Tax Court's decision in *May v. Commissioner,* 76 T.C. 7, 13 (1981), *appeal pending,* (9th Cir. No. 82–7658). The tests are sufficiently similar for purposes of this decision.

In *Rosenfeld,* the United States Court of Appeals for the Second Circuit noted that the authorities are divided on the proper tax treatment of claimed rental deductions in these circumstances. As noted there, the Tax Court's recent decisions have allowed the deductions but the Courts of Appeals have split on the issue. 706 F.2d at 1279. The Third Circuit in *Brown v. Commissioner,* 180 F.2d 926 (3d Cir.), *cert. denied,* 340 U.S. 814, 71 S.Ct. 42, 95 L.Ed. 598 (1950); the Seventh Circuit in *Skemp v. Commissioner,* 168 F.2d 598 (7th Cir.1948); the Eighth Circuit in *Quinlivan v. Commissioner,* 599 F.2d 269 (8th Cir.), *cert. denied,* 444 U.S. 996, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979); and, the Ninth Circuit in *Brooke v. United States,* 468 F.2d 1155 (9th Cir.1972) have all held in favor of the taxpayer. The Fourth Circuit in *Perry v. United States,* 520 F.2d 235 (4th Cir.1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 782, 46 L.Ed.2d 641 (1976), and the Fifth Circuit in *Van Zandt v. Commissioner,* 341 F.2d 440 (5th Cir.), *cert. denied,* 382 U.S. 814, 86 S.Ct. 32, 15 L.Ed.2d 62 (1965), and *Mathews v. Commissioner,* 520 F.2d 323 (5th Cir.1975), have held with the Commissioner in similar circumstances. The Second Circuit, in *Rosenfeld,* joined those courts holding in favor of the taxpayer.

An analysis of *Rosenfeld* will be helpful because the Government pressed similar arguments there as those made here. In 1963, Rosenfeld, a doctor, purchased some land and built an office building which he alone occupied after 1964. In 1969, he established a trust for the benefit of his children and transferred the land and medical office to the trust. An independent appraiser, prior to creation of the trust, estimated the fair rental value of the property to be $14,000 per year. Rosenfeld created an irrevocable trust with a term of 10½ years. Thereafter, the trust corpus reverted to Rosenfeld. Rosenfeld's accountant and his attorney were named as trustees. The trust agreement was executed on July 1, 1969, and that same day Rosenfeld entered into a lease with the trustees. Rosenfeld agreed to rent the property for the entire term of the trust for annual rental payments of $14,000. During the period of the trust, Rosenfeld remained liable for the mortgage payments and general upkeep of the property. Rosenfeld was also required under the lease to pay the utility and other incidental expenses and had the right to construct additions to the building at his own expense. The trustees were responsible for payment of the real estate taxes. At a later time, Rosenfeld transferred his reversionary interest to his wife.

The IRS disallowed the rental deduction claimed by Rosenfeld. The Commissioner in *Rosenfeld* argued that because Rosenfeld had voluntarily entered into the arrangement which created the need to pay rent, the gift-leaseback was a sham and he should not be allowed the deduction. *Id.* at 1280.

The Commissioner conceded, however, that the lease was properly executed and did not challenge the reasonableness of the

rent. Nevertheless, the Commissioner felt that several elements of the *May* test, delineated above, had not been satisfied. First, the Commissioner argued that Rosenfeld had, in fact, retained control of the property. Presumably, this argument was made because of the professional relationship between the trustees and Rosenfeld. However, the Second Circuit agreed with the Tax Court that the first element of the *May* test had been satisfied. Under the trust agreement, the trustees were authorized to mortgage or sell the property, grant easements and exercise other powers traditionally associated with ownership. *Id.* at 1281. Rosenfeld was obligated to pay rent and the term of the lease, as amended, did not coincide with the length of the trust. The Commissioner had presented nothing to persuade the court that the trustees were anything other than independent. Thus, because of the broad grants of power to the trustees and the consequent diminishment of Rosenfeld's rights, together with the actual independence of the trustees, the court found that the grantor had not retained substantially the same control over the property that he had before he transferred the property to the trust. *Id.*

■ Here, as in *Rosenfeld,* the Trustee was granted broad powers under the trust agreement. Although the Company was able to continue to use the equipment and vehicles due to the lease agreement, it relinquished the right, *inter alia,* to sell the property. The Company became a custodian of the property after the transfer to the trust. Moreover, there was no evidence that the Bank was not an independent trustee. While this Court cannot say that a Bank would, in all circumstances, be considered to be an independent trustee, the use of a Bank, as opposed to one's personal accountant or lawyer, seems to be deserving of an inference of independence. The fact that the Company had a banking relationship with Millikin National Bank does not dispel the trustee's independence. To adopt the Government's argument that the Bank could not be considered independent because of its previous relationship with the Company amounts to requiring a grantor who wishes to utilize a financial institution as trustee to appoint a Bank with which he has never dealt. This requires too much. This Court finds that the trustee was independent, that there was an "arms-length" relationship between the parties involved, and that the grantors did not retain substantive control over the trust.

The court in *Rosenfeld* rejected the business purpose standard of review proposed by the Commissioner. There the Commissioner argued that both the creation of the trust and the leaseback must be imbued with a business purpose. The court instead stated that if the legal rights and beneficial interests of the parties had changed, there was no basis for labeling a transaction a "sham" and ignoring it for tax purposes. *Id.* at 1282. The court found significant changes in the legal rights of the parties resulting from the grant of broad powers to the trustee and the concomitant diminution in Rosenfeld's authority. Additionally, the court felt that the lack of a reversionary interest in the property was also relevant, together with the obligation of Rosenfeld to pay rent and the duty of the trustee to collect rent. The court found the leaseback to be motivated by concerns other than tax savings and to be a business necessity. Rosenfeld needed a place to practice medicine and the rental payments were a condition of continued occupancy. *Id.*

The Commissioner argued, however, that nothing had changed because Rosenfeld was occupying the same premises as a lessee which he previously used as an owner. *Id.* at 1282–83. The Government has made essentially the same argument here—that the Company had full use of the property both before and after the transfer in trust. In addition, the Government has argued that the grantors did not attempt to lease the property elsewhere and that the trust did not search for other lessees. The Government argues here that a trust arrangement was not required, that the necessary leasing could have been obtained through any leasing company. Of course, a trust arrangement was not required, but it was preferred. So long as the parties complied

with the applicable laws, they were free to take advantage of legitimate tax-saving vehicles. As the Second Circuit recognized:

> Rosenfeld could have given the property to his children in trust and leased property from a third party for an amount equally fair and reasonable for his medical office. It is clear, and indeed, counsel conceded at oral argument, that a rent deduction would have been entirely proper in such a case. *See Frank Lyon Co. v. United States,* [435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978)]. In real terms, there is little difference between this hypothetical case and the events the Commissioner challenges. In both cases, Rosenfeld would have voluntarily relinquished his right to occupy his offices rent-free, and created the need to lease other premises. It can hardly be a matter of concern for the Commissioner whether Rosenfeld rents from the trust rather than from some third party. In either situation he would be required to pay rent, and the trust could receive rental income from the property it owned.

*Id.* at 1283.

The same can be said here. The Company desired to lease, rather than own, certain equipment. The rentals were determined by reference to the Bank's leasing schedules and the amount has not been challenged as unreasonable. Its decision to lease from the trust, as opposed to a third person, should not disqualify an otherwise valid transaction. As the Second Circuit succinctly stated:

> Many financial decisions are motivated by the prospect of legitimate tax savings, rather than business concerns, and we have already expressed our agreement with Judge Learned Hand's view that a transaction which is otherwise legitimate, is not unlawful merely because an individual seeks to minimize the tax consequences of his activities. *See Helvering v. Gregory, supra* [69 F.2d 809 (2 Cir. 1934)], *Gilbert v. Commissioner,* 248 F.2d 399, 411 (2d Cir.1957) (L. Hand dissenting).

*Id.* at 1281. Moreover, *Rosenfeld* accords with Seventh Circuit precedent in *Skemp v. Commissioner,* 168 F.2d 598 (7th Cir.1948).

The legal rights and obligations of the parties changed here after the transfer in trust. The Evans brothers retained no reversionary interest in the property. In creating the trust, they granted broad powers to an independent trustee, thus relinquishing all incidents of ownership. They became obligated to pay rent, which has not been challenged as unreasonable, and the trustee had a duty to collect that rent. There were business reasons, other than tax savings, *i.e.,* the desire for centralized leasing, which motivated the entire arrangement.

As for the Government's argument concerning § 482, that section allows the IRS to reallocate income and deductions between two organizations controlled by the same interests in order to clearly reflect the income of such organizations. In light of this Court's finding that the Bank as trustee exercised independent control over the trust, § 482 is inapplicable.

Accordingly, for the reasons stated above, the determination of the IRS is reversed and refunds in the amounts stated above are hereby ordered to be paid to plaintiffs.