**BROWN v. COMMISSIONER OF INTERNAL REVENUE (two cases).**

Nos. 10051, 10052.

United States Court of Appeals
Third Circuit

Argued January 4, 1950.

Decided Feb. 28, 1950.

Scott P. Crampton, Washington, D. C. (Geo. E. H. Goodner, Washington, D. C., on the brief), for petitioners.

Melva M. Graney, Washington, D. C. (Theron Lamar Caudle, Assistant Attorney General, Ellis N. Slack, Special Assistant to the Attorney General, on the brief), for respondent.

Before BIGGS, Chief Judge, and MARIS and KALODNER, Circuit Judges.

MARIS, Circuit Judge.

These cases involve the deductibility as business expenses in computing the net taxable income of the taxpayers of certain rents and royalties paid by them to the trustee of two trusts created by them for the benefit of their children. They grow out of the following facts:

Taxpayers are husband and wife, residing in Clearfield, Pennsylvania. Their individual tax returns for the calendar year 1944 were filed on the cash receipts and disbursements basis.

Taxpayers were engaged as partners in the general contracting and coal-mining business. In 1943 the business was growing. They owned a large equity in equipment worth about $150,000 and owned several coal properties which were then being operated. In their mining operations they made use of a railroad siding for loading coal, then owned by H. F. Bigler, Jr. The railroad siding consisted of a single track with a ramp or tipple from which coal could be loaded from trucks into railroad cars. The siding connected with the Baltimore & Ohio Railroad and was capable of holding approximately 30 coal cars. Taxpayers paid a wheelage charge of $2.50 a car, regardless of the amount of coal loaded. The amount of coal held by one coal car ranges from 50 to 70 tons.

By deed dated June 7, 1943, taxpayers, as husband and wife, acquired from H. F. Bigler, Jr., and wife, for a consideration of $4,500, title to 8.9 acres of land located just outside the borough limits of Clearfield, Pennsylvania. The railroad siding was one of the improvements on this land.

By deed dated September 29, 1943, taxpayers acquired for $3,000 a 35-acre tract of coal land located about three miles north of Clearfield and known as the Kephart tract. Testings had been made on this tract and evidences of coal discovered. Prior to January 3, 1944, taxpayers had commenced or were about to commence mining operations on this tract.

Sometime prior to January 3, 1944, taxpayers discussed with their attorneys, Harry Boulton and his son, Harold J. Boulton, the matter of the future financial security of their two sons, Robert Earl Brown, born August 10, 1941, and Allan Murray Brown, born July 2, 1943. The creation of a trust was suggested. A plan was agreed upon whereby the title to the 8.9-acre tract upon which the railroad siding was located and to the 35-acre coal land was to be transferred to a trustee, with the understanding that the properties were to be leased to taxpayers, who were, as was always intended, to continue to operate them under their partnership agreement.

On January 3, 1944, taxpayers formally executed two irrevocable trust agreements, under each of which they conveyed to Harold J. Boulton, as trustee, an undivided one-half interest in the tracts for the benefit of taxpayers' two sons. The trust agreements are identical except as to the names of the beneficiaries. Each trust contained, *inter alia,* the following provisions:

"1. During the continuance of the Trust, The Trustee shall have the absolute right, in his sole discretion, to operate, manage, sell, convey, transfer, lease, assign and convey any and all, or any part of the said Trust Estate, and to make, execute and deliver good and sufficient deeds, indentures or other written instruments to the purchaser or lessee at whatever price and upon whatever terms may to him seem wise; and the Trustee shall have the right to consent to assignments by lessees and to modify or cancel lease contracts for any part of the trust estate, if power and occasion should be reserved or arise under the terms of the lease agreement or agreements.

\*     \*     \*     \*     \*     \*

"3. The income from the Trust Estate shall be held and accumulated by the Trustee for the duration of the Trust but not exceeding twenty-one years after the death of the survivor of the grantors nor longer than the minority of the beneficiaries; and he shall have the right at all times to pay out of the income at his discretion such sums as he may deem necessary for the support, maintenance and education of any of the beneficiaries who at the time of such payment would be entitled to receive all or part of the Trust Estate as though it were then terminated, and it is specifically authorized that the Trustee may invest any or all of the income, or of the principal if converted into cash, in additional real estate or in leases of additional real estate. The income, after the dates fixed for accumulation thereof shall be paid from time to time to those entitled as though the trust had at the date of such payments been terminated.

"4. The first beneficiary of the Trust Estate hereby created is Allan Murray Brown, a minor child of the Grantors

herein, subject to the hereinafter stated terms and conditions of the Trust; but if the said Allan Murray Brown should die before attaining the age of twenty-five years, his surviving children in the first place, or if the said Allan Murray Brown shall not have children to survive him, then his surviving brothers and sisters in the second place, in the order named, are substituted as beneficiaries.

"5. The Trust Estate shall terminate upon the first beneficiary arriving at the age of twenty-five years; if the first beneficiary shall die prior to the date fixed for the termination of the Trust, the duration of the Trust Estate shall, nevertheless, so far as concerns the principal of the Trust Estate, continue until the youngest of the respective substituted beneficiaries shall arrive at the age of twenty-one years, and the Trust shall continue for such substituted term with the same powers as herein set forth. Upon the termination of the Trust Estate, the Trustee shall execute sufficient conveyances and assignments in fee simple as to real estate and absolutely as to personalty, to the beneficiary or beneficiaries of all the corpus of the Trust Estate, including income which may have accumulated."

On January 4, 1944, the day after the trust agreement was executed, taxpayers entered into a written agreement with Harold J. Boulton, as trustee, whereby taxpayers were granted the exclusive right and privilege to occupy and use the railroad siding for a period of 10 years upon the payment of a rental of 7¢ per ton for each and every ton of coal or clay loaded upon the premises in railroad cars and shipped over the siding. In addition, the lessees (taxpayers) were to keep the railroad siding and equipment in good repair and were to save harmless and indemnify the lessor and the railroad from any loss, damage or expense by reason of injury to persons or property arising from use or occupation of the described premises, including any appurtenant sidewalks or driveways. The lease also provided for the payment of a minimum rental of $25 a month, prohibited the assignment or subletting without the

lessor's consent, and gave the lessor certain redress in case of default.

Under the same date of January 4, 1944, taxpayers entered into another written agreement with Harold J. Boulton, as trustee, whereby taxpayers were granted, for a period of five years, the right to mine and take for their own use and benefit all the coal and fire clay upon the 35-acre tract acquired by taxpayers on September 29, 1943, upon the payment of 25¢ a ton for coal mined and 10¢ a ton for clay produced from the premises. The agreement also provided for the payment of a minimum rental of $50 a month, for which credit was to be given upon the royalty paid; prohibited assignment of subletting without the lessor's consent; and gave the lessor certain redress in case of default.

The 25¢ a ton paid by taxpayers to the trustee for coal mined on the 35-acre tract and the 7¢ paid by taxpayers to the trustee for each ton of coal loaded over the railroad siding constituted reasonable royalties and rentals for the use of the facilities leased.

The transfers of the coal acreage and railroad siding by taxpayers to the trustee of the trust for taxpayers' children were integrated steps in one transaction.

In 1944 taxpayers paid to Harold J. Boulton, as trustee of the two trusts, the sum of $10,278.90, representing royalties on coal mined on the 35-acre tract, and the sum of $10,203.38, representing rentals for the use of the railroad siding. Taxpayers claimed these amounts as deductions on their partnership return for 1944. The Commissioner disallowed the deductions.

The only person other than taxpayers who made use of the railroad siding during 1944 was H. F. Bigler, Jr. For such use he paid taxpayers $26. This amount was paid over by taxpayers to the trustee. Taxpayers did not report it in their partnership return of income for 1944. The Commissioner has included this amount as income in computing the income from business taxable to taxpayers.

On the above facts, the Tax Court in banc, six judges dissenting, held that tax-

payers merely intended and made a gift of their partnership income in the amounts of the rents and royalties and that those amounts were not, and were not deductible as, rents or royalties or ordinary or necessary expenses of taxpayers' business within the provisions of Section 23(a) (1) (A) of the Internal Revenue Code, 26 U.S.C.A. § 23(a) (1) (A). The Tax Court also held that the $26 paid to taxpayers for use of the railroad siding and paid over by taxpayers to the trust was income to taxpayers. 12 T.C. 1095. The taxpayers thereupon brought the cases here for review.

We find ourselves in accord with the views expressed by Judge Arundell in his dissenting opinion in the Tax Court. There is no suggestion that the two trusts in question were not created in good faith nor that they were not valid and irrevocable. By the trust agreements the taxpayers irrevocably conveyed to an independent trustee title to the land upon which the siding was located and the coal land. The trustee then leased them back to the taxpayers upon what were found by the Tax Court to be reasonable rents and royalties. It is true that this was done pursuant to a prior understanding between the taxpayers and the prospective trustee but we do not regard this point as significant. What is controlling is that there came into the picture a new independent owner, the trustee, who was in a position to and did require the payment of the rents and royalties as a condition to the continued use and possession of the lands by the taxpayers for the purposes of their business, and wholly without regard to whether their operations resulted in taxable income.

Under these circumstances the conclusion of the Tax Court that the rents and royalties paid by the taxpayers to the trustee were merely gifts of their partnership is clearly wrong. The taxpayers were legally obligated to pay the rents and royalties for the use of the siding and the mining of the coal even though their operations had resulted in a loss. The deduction of these rents and royalties was authorized by the express language of Section 23(a)

(1) (A) of the Internal Revenue Code, as follows:

"(a) Expenses.—

"(1) Trade or business expenses.

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

A case in all significant respects identical with the one now before us was before the Court of Appeals for the Seventh Circuit in Skemp v. Commissioner, 1948, 168 F.2d 598. Judge Minton, speaking for the court in that case, used the following language which is equally applicable to this one, 168 F.2d at pages 599, 600: "The Commissioner argues that the payments as rent were not required because the taxpayer had voluntarily entered into the transaction. While the taxpayer voluntarily created the situation which required the payments of rent, the fact remains that the situation created did require the payments. In this case we have a valid, irrevocable trust, wholly divesting the taxpayer of any interest in the trust property, and an agreement by the taxpayer to pay the trustee a reasonable rental under a valid lease. The income from the property is not claimed in this proceeding to be that of the taxpayer. We have here only a question of deduction of rental from gross income. There can be no question but what rent required to be paid is properly deductible. The trustee was duty bound to exact rent of the taxpayer and the taxpayer was legally bound to pay it, just as much as if the taxpayer had moved across the street into the property of a third party. No one doubts that he would have had to pay rent then, and would have been entitled to deduct it even though he had voluntarily created that situation. We are not impressed with the argument of the

930

Government that the taxpayer voluntarily created the present situation."

The decision of the Tax Court will be reversed and the cause will be remanded for further proceedings not inconsistent with this opinion.

KALODNER, Circuit Judge.

I dissent.

The real issue here is the effect to be given by an appellate court to Rule 52(a), Federal Rules of Civil Procedure, 28 U.S. C.A., made applicable to the review of decisions of the Tax Court by Section 1141(a) of the Internal Revenue Code, 26 U.S.C.A. § 1141(a), and to the construction given Rule 52(a) by the Supreme Court of the United States in United States v. United States Gypsum Co., 1948, 333 U.S. 364, 394-395, 68 S.Ct. 525, 92 L.Ed. 746. See also, United States v. Yellow Cab Co., 1949, 338 U.S. 338, 70 S.Ct. 177.

In Commissioner of Internal Revenue v. Penn Athletic Club Bldg., 3 Cir., 176 F. 2d 939 we held, page 943, that under Rule 52(a) "It is our function *merely* to determine whether the Tax Court erred as a matter of law and whether its fact finding was 'clearly erroneous'." (Emphasis supplied.)

In the instant cases the majority of the Tax Court, after consideration of the evidence, came to the factual conclusions that the "rents" and "royalties" paid by the taxpayers were in reality "gifts" of their partnership income and as such were not deductible as ordinary or necessary expenses of the taxpayers' business; that the purposes of the trusts were " * * * to provide financial security for the petitioners' children and, at the same time, leave the partnership coal business and the properties used therein undisturbed under the continued management and control of the partnership consisting of petitioners (taxpayers)"; and that the taxpayers "did not intend that any benefit, advantage or consideration should result to or be received by the partnership in its business by the arrangement under scrutiny."

In connection with the majority's factual conclusions it may be pointed out that one of the taxpayers testified that the lease back from the trustee was made for a five year term because that "was a reasonable time to figure on exhausting" the coal in the leased tract and that the latter would not be worth "anything to amount to" thereafter.

The dissent in the Tax Court discloses the existence of an area of conflicting inferences with respect to the transaction involved. On that score it need only be said as we did in the Penn Athletic Club case, supra, 176 F.2d at page 944: " * * * the finding of the Tax Court was supported by evidence which permitted at most conflicting inferences (as was evidenced by the contra fact finding of the minority of the Tax Court) and is therefore conclusive here."

For the reasons stated I would affirm the decision of the Tax Court.