C. James **MATHEWS** et al.,
Petitioners-Appellees,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

No. 74–2084.

United States Court of Appeals,
Fifth Circuit.

Oct. 1, 1975.

Rehearing and Rehearing En Banc
Denied Nov. 21, 1975.

Before RIVES, WISDOM and MORGAN, Circuit Judges.

### ORDER

**324**

Richard M. Roberts, Acting Asst. Atty. Gen., Ernest J. Brown, Acting Chief, Appellate Section, Bennet N. Hollander, Richard Farber, Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., Meade Whitaker, Chief Counsel, Birmingham, Ala., for respondent-appellant.

Thomas D. Aitken, Michael D. Annis, Tampa, Fla., for petitioners-appellees.

Before BROWN, Chief Judge, and MURRAH * and WISDOM, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Because our system of taxing personal income employs a progressive rate,[1] taxpayers may reduce its impact on them if they can split their income amongst family members. The Mathews (Taxpayers) —operators of a funeral home in Florida—attempted this by transferring ownership of the property used in the husband's wholly-owned business to a trust, leasing it back, then deducting the rental payments.[2] They contend the arrangement succeeded in its purpose of crossing to the less burdensome side of the line between *Van Zandt*[3] and *Skemp*.[4] The Tax Court agreed,[5] but we do not. So we disallow the rental deductions.

In cases such as this, the circumstances of the trust settlement are significant—and here, undisputed. The trust was of 10 years plus one day duration, with the corpus reverting to the grantor-settlors at expiration.[6] Under the trust, income was to be paid to Mrs. Mathews, as guardian, for the benefit of taxpayers' children, the beneficiaries. Mr. Mathews' (the settlor) attorney was named as trustee. Pursuant to earlier agreement made contemporaneously or shortly before executing the trust indenture, the trustee leased—with year to year renewal options—the entire corpus to Mathews. The Tax Court found—and we have no reason to discredit it—the attorney, wearing his trustee hat, did

---

* Senior Circuit Judge of the Tenth Circuit, sitting by designation.

1. Int.Rev.Code of 1954, § 1.

2. See, *Id.*, 26 U.S.C.A. § 162(a)(3).

3. *Van Zandt v. Commissioner*, 5 Cir., 1965, 341 F.2d 440. This relied heavily on our earlier *W. H. Armston Co. v. CIR*, 5 Cir., 1951, 188 F.2d 531.

4. *Skemp v. Commissioner*, 7 Cir., 1948, 168 F.2d 598. Taxpayer also stresses *Brown v. CIR*, 3 Cir., 1950, 180 F.2d 926, and *Brooke v. United States*, 9 Cir., 1972, 468 F.2d 1155, as well as the gift cases, *Visintainer v. CIR*, 10

Cir., 1951, 187 F.2d 519, and ours in *Henson v. CIR*, 5 Cir., 1949, 174 F.2d 846.

5. See, C. J. Mathews, 61 T.C. 12, Dec. 32, 161.

6. Later, Taxpayers irrevocably conveyed their reversionary interest to their children. The Government does not here challenge the arrangement after that date nor do we pass on it. *Brooke v. United States*, 9 Cir., 1972, 468 F.2d 1155, is different because no reversionary interest remained in that taxpayer—unlike our case. But as to other factors *Brooke* cannot be squared with *Van Zandt* by which we are bound.

everything that reasonably could be expected to protect the children's interest.

 In *Van Zandt*, before which Taxpayers flee, the arrangement was very similar. The only real difference—the one urged by Taxpayers—is in the trustee's identity. *Van Zandt* took no chances—or perhaps too many—naming himself trustee. But this was but one of several factors. The outcome would not have differed had there been an outside independent trustee. We think *Van Zandt* teaches that it is not sufficient merely to serve up some "business purpose" as some of the cases put it. The fact taxpayers can conjure up some reason why a businessman would enter into this sort of arrangement—tax consequences aside—does not foreclose inquiry.[7] Rather there must be "economic reality", *Furman v. Commissioner*, 1966, 45 T.C. 360, *aff'd per curiam*, 5 Cir., 1967, 381 F.2d 22.[8]

In deciding the federal questions of income tax law, we must examine transactions with substance rather than form in mind. If we stood at the top of the world and looked down on this transaction—ignoring the flyspeck of legal title under state law—we would see the same state of affairs the day after the trust was created that we saw the day before.

We think the critical element of this is the trustee's pre-execution agreement with Taxpayers which for all practical purposes assured them the property constituting the essential plant facility for Taxpayers' otherwise wholly-owned business would be available throughout the term of the trust. Taxpayer would distinguish *Van Zandt* on this point because the initial lease there covered the entire trust term, whereas this one merely covered one year—with a year-to-year option to renew. Practically, however, the distinction is without a difference. Taxpayers' effective control of the property for the duration of the term was practically assured, notwithstanding the trustee's independence. Similarly, the fact rent negotiations produced "reasonable" results is totally irrelevant. Any bargaining is simply not at arm's length, because any rent exceeding expenses stays in the Mathews family.

In short, before the trust's creation Taxpayer operated his business on and with necessary property—all under his complete control. The same was true afterward—except he hoped some of his income had been siphoned off to his children. As in *Van Zandt* what was carefully planned to achieve a total result cannot be split into separate parts.

Deduction of rental payments to such "economic nullities" is not contemplated by § 162(a)(3).

Reversed.

---

**7.** Taxpayers contend their desire to (i) isolate the property from liability, and (ii) discourage employees from aspiring to partnership constitutes such business purposes. As to (i) it is not impressive since taxpayers' equitable and reversionary interests—as well as rights under the lease—are probably reachable by creditors. For (ii) taxpayers continued in the mortuary business which was presumably producing the profits which employees might envy and covet so the status of some of the operational assets as owned or leased would not discourage such hopes.

**8.** See Judge Ely's dissent in Brooke, *supra*, 468 F.2d at 1159.