W.B. LASHER COMPANY DBA WES LASHER VOLKSWAGEN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WES LASHER PORSCHE-AUDI, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
W.B. Lasher Co. v. Commissioner
Docket No. 21863-80, 21864-80.
United States Tax Court
T.C. Memo 1986-249; 1986 Tax Ct. Memo LEXIS 361; 51 T.C.M. (CCH) 1234; T.C.M. (RIA) 86249; June 18, 1986. Mark S. Sewell, for the petitioner. Beatrice M. Pearson, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax and determined additions to tax under section 6653(a)[1] as follows: W.B. Lasher Company
dba Wes Lasher Volkswagen
("Lasher VW")
Deficiency
Addition
1975
$79,498.00
$3,975.00
1976
26,182.00
1,309.00
Wes Lasher Porsche-Audi, Inc.
aka Lasher Porsche-Audi,
Inc. ("Lasher Porsche-Audi")
Deficiency
Addition
1975
$33,684.00
$1,684.00
1976
9,856.00
493.00
*362 After concessions [2] the sole issue for determination is whether LasherVW and Lasher Porsche-Audi are entitled to claimed rental expense deductions under section 162(a)(3) concerning payments with respect to sale and leaseback transaction with the Lasher Family Trust. *363 The stipulated findings of fact and accompanying exhibits are incorporated herein by this reference as is the post-trial partial stipulation of settlement. FINDINGS OF FACT Petitioners, LasherVW and Lasher Porsche-Audi, each maintained a principal place of business at Sacramento, California, when the petitions herein were filed. Wesley B. Lasher ("Wes") and Inez Lasher ("Inez") owned as community property all of the issued and outstanding stock of LasherVW and Lasher Porsche-Audi during all relevant periods to these cases until December 30, 1975. Wesley B. Lasher Investment Corporation ("Lasher Investment") was incorporated on December 31, 1975, at which time it issued all of its outstanding class A voting common stock to Wes. [3]Lasher Investment acquired the entire stock interest of LasherVW and Lasher Porsche-Audi on December 30, 1975. *364 LasherVW was incorporated during the year 1956. Lasher Porsche-Audi was incorporated during the year 1973. During the years at issue, petitioners were engaged in business as retail automobile dealerships under agreements with Volkswagen of America, Inc. and the Porsche-Audi Division of Volkswagen of America, Inc. Prior to the year 1956, Wes had been employed with a paper company as a sales manager with geographic responsibility for the Western United States. Wes left the paper company to avoid a relocation to the Mid-West. At that time, Wes joined a company which sold or leased heavy operating equipment such as trucks, tractors, and earth graders. Wes had entered the heavy equipment business with a view to secure an automobile dealership franchise. Wes considered franchise opportunities with General Motors' Buick and Cadillac Divisions, but ultimately entered into a franchise agreement with Volkswagen of America, Inc. during the year 1955. LasherVW and Lasher Porsche-Audi are accrual basis, calendar year taxpayers. During the relevant periods to the determinations herein, petitioners elected the following individuals to serve as officers: LasherVW
Wes, President *365 and Treasurer Robert B. Suber ("Suber"), Vice President Gilbert Hetzel ("Hetzel"), Vice President Charles B. Beveal, Vice President Lilo Maskow, ("Maskow"), Secretary and Assistant Treasurer Shirley A. Thrasher ("Trasher"), Assistant Secretary Lasher Porsche-Audi
Wes, President and Treasurer Inez, Vice President Thrasher, Secretary Maskow, Assistant Secretary Petitioners also elected Wes, Inez, and Maskow to serve as directors during all relevant periods herein. Respondent's determinations within the notices of deficiency arise from a series of transactions developed by financial planners Harold B. DeJulio ("DeJulio") and George G. Nicoladze ("Nicoladze"). DeJulio and Nicoladze were recommended to Wes by another local automobile dealer who operated several franchises. Wes desired to accomplish certain financial objectives. One such objective was to consolidate the personnel of LasherVW and Lasher Porsche-Audi to avoid duplicative administrative burdens, such as payroll and job assignment, which are typically associated with multiple employers. Wes also desired to improve employee benefit plans and to discuss the feasibility of employee stock ownership *366 plans to compensate and provide incentive to certain employees who had served petitioners for many years. Wes was not certain whether his sons Mark B. Lasher ("Mark") and Scott Ryan Lasher ("Scott") would participate in the automobile dealerships. However, Wes wanted to insure that compensatory incentives and the opportunity for his sons to develop the business skills necessary to operate the dealerships were available in the event they entered into the business. Lastly, Wes sought recommendations concerning general tax planning and personal financial counseling, including estate planning considerations. After consultations, Wes employed DeJulio and Nicoladze in November of 1975 to develop a financial strategy to effectuate the aforementioned objectives. In December of 1975, Wes implemented the recommendations of DeJulio and Nicoladze. Such recommendations entailed the creation of three new entitles: (1) Lasher Investment, (2) the Lasher Service Corporation ("Lasher Service"), and the Lasher Family Trust ("Lasher Trust"). Lasher Investment was incorporated specifically to manage and control the investment of Wes. Lasher Investment issued all of its outstanding Class A voting *367 common stock to Wes. Lasher Investment entered into a service employment arrangement with Wes on February 2, 1976. Lasher VW agreed to pay Lasher Investment an annual management fee for the service of Wes. [4]Lasher Investment adopted a fiscal year ending January 31. Lasher Service was incorporated on December 2, 1975. The original shareholders of Lasher Service were Suber, Hetzel, and Maskow, each of whom had been dedicated and loyal employees of LasherVW for several years. During the years at issue, each also served as elected officers of LasherVW. During 1975, Thrasher also became a record shareholder of Lasher Service. Thrasher was an officer of petitioners throughout the period at issue. The employees of LasherVW and Lasher Porsche-Audi, including sales personnel, mechanics, and administrative *368 employees, became employed by Lasher Service. Petitioners' employee benefit plans were transferred to new plans administered on behalf of the employees of Lasher Service. The existing union agreements negotiated on behalf of petitioners' employees were to remain effective as to Lasher Service. Lasher Service and petitioners negotiated "service agreements" such that Lasher Service agreed to "provide at its expense all the personnel that in its judgment may be needed to provide sales, administrative, clerical, and maintenance" services required by petitioners. Lasher Service adopted a fiscal year ending November 30. The "Service Agreements" provided that petitioners would pay Lasher Serve for its employee services on a quarterly basis as of March 1, June 1, September 1, December 1 of each year and that such amount would be due on the first day of each quarter. Lasher Service adopted a fiscal year ending November 30. [5]
*369 The Lasher Trust was created on October 1, 1975, as an integral function of the overall financial plan designed by DeJulio and Nicoladze. The Lasher Trust was funded in the amount of $100.00 by George A. Lasher as Trustor. George A. Lasher is the father of Wes. The Lasher Trust designated Mark as Trustee.The beneficiaries of the Lasher Trust are Mark and Scott, the grandchildren of George A. Lasher and "any other grandchildren born or adopted". Scott has no knowledge of the assets or cash flow of the Lasher Trust, and the Lasher Trust has not provided him with any accounting. The Lasher Trust is a cash basis taxapayer utilizing a fiscal year ending of February 28. The Lasher Trust provides Mark, as Trustee, the "right, power, and sole discretion to employ a manager for the management, protection, control, sale or other disposition" of the Trust "estate and property and all the assets thereof, or for any parts thereof." The Lasher Trust contains no limitation as to who Mark could employ as such manager. The Lasher Trust is irrevocable. However, it provided George A. Lasher, as Trustor, the power to dismiss the Trustee and appoint "any person other than himself and the father *370 of the beneficiaries" to act as Trustee and further provided the Trustor the right to assign such power to any person "who in his opinion may qualify as competent appointers." The Lasher Trust also provided that the Trustee may apply income and principal, up to the entire amount of the corpus, for care, support, and maintenance, including reasonable luxuries for the benefit of Inez, the beneficiaries' mother, during her widowhood. On March 5, 1976, Lasher VW executed a Bill of Sale with the Lasher Trust whereby the Lasher Trust agreed to purchase for the amount of $105,814.00 certain equipment and furniture used by Lasher VW in the conduct of its business. Mark, as Trustee of the Lasher Trust, executed an unsecured promissory note payable to Lasher VW for the total purchase price of $105,814.00 to be repaid over a ten year period in equal annual payments with interest at four percent per annum on the unpaid balance. In a simultaneous transaction, Lasher VW agreed to leaseback such property until February 28, 1981, a period of four years, and the lease agreement provided for a monthly lease payment during the term of agreement in the amount of $2,645.00. The lease agreement further *371 provided Lasher VW an option to extend such lease for an additional period of five years ending February 28, 1986. The renewal option provided that the monthly rental payment was to be two and a half percent of the listed value of such assets as provided within the appendix attached to the Bill of Sale. Also on March 5, 1976, Lasher Porsche-Audi executed a Bill of Sale with similar provisions in the amount of $40,662.00 to Mark, as Trustee, of the Lasher Trust conveying to the Trust the equipment and furnishings used to conduct its business. Mark, as Trustee, executed an unsecured promissory note for the full purchase price of such sale. The note provided for ten annual equal payments or principal with interest at four percent per annum on the unpaid balance. Under terms similar to that of Lasher VW, Lasher Porsche-Audi agreed to leaseback the subject equipment and furniture for a period of five years. Lease payments were due monthly in the amount of $1,016.55. The lease agreement provided an option to extend for an additional period of five years until February 28, 1981. The lease agreement further provided that the monthly payment be calculated as two and a half percent *372 of the listed value of such assets as identified and valued within the appendix attached to the agreement. Wes arranged to have petitioners' equipment and furnishings subject to the foregoing sale and leaseback transactions appraised prior to their sale. The furnishings were appraised by a representative of Western Contract Furnitures, a large, regional supplier of office furniture. The automobile service equipment was also appraised by a regional supplier of such items. The basis of appraised value was "current replacement costs". The appraised values of the subject assets were attached to each Bill of Sale and lease agreement executed between each petitioner and the Lasher Trust. The appraised value of the Lasher VW assets and the Lasher Porsche-Audi assets were the same as the purchase price agreed to by the Lasher Trust, $105,814.00 and $40,662.00 respectively. None of the individuals who appraised the subject assets testified at trial. Petitioners each reported the gain which resulted from such transactions. [6]
*373 At trial, Michael A. Mecey ("Mecey") testified on behalf of petitioners concening the appropriateness of the monthly two and one half percent lease fee. Mecey had prior employment experience calculating lease rates within the health care equipment industry. Mecey did not view the subject assets or examine the inventories of such assets. Mecey testified that the reasonable rate on a ten year lease of equipment during the years at issue would have been 1.675 percent per month. Petitioners, on brief, concede that the rental rate of two and one half percent per month was not reasonable and assert that Mecey's opinion be adopted. Mecey's analysis assumed a fair market value of the subject assets to be $150,000. Mecey testified that as an industry practice, lease payments are payable in advance of each month. The agreed lease rate of two and one half per month was suggested by DeJulio and Nicoladze. Wes, as petitioners' representative, and Mark, as Trustee of the Lasher Trust, adopted these terms without modification or negotiation. Maskow, a shareholder-employee of Lasher Service, performed all bookkeeping service for the Lasher Trust. Maskow was instructed by Alex F. Klimen, *374 C.P.A. ("Klimen"), as to the necessary accounting journal entries. Klimen had been employed as an accountant to petitioners, Lasher Service, Lasher Investment and Lasher Trust until his death in August of 1978. The Lasher Trust opened a checking account ("Trust Account") on December 23, 1975. The Trust Account was held by Wes and Mark as joint tenants with right of survivorship, each of whom was authorized signatories. Wes had personally opened the Trust Account, and Mark did not accompany Wes to open such account. The Trust Account was a noninterest bearing investment and remained the sole such account until April 15, 1982. The administration of the Trust Account was not performed according to the Lasher Trust instrument. Although the Trust Account appointed Wes as a joint survivor with signatory authority, the Lasher Trust instrument provided Wes with no such powers. During the years 1976 through 1979, Wes signed 81 of the 138 checks drawn on the Trust Account, including Lasher Trust payments of principal and interest concerning the Lasher Trust notes payable to petitioners. [7] The Lasher Trust issued 25 checks in the total amount of $3,500.00 to Scott during the years *375 1977 through 1979 while Scott attended college. Wes signed 23 such checks. Wes testified that he routinely signed all checks on Maskow's desk. During the year 1977, the Lasher Trust acquired life insurance policies with respect to Wes and Inez. The dollar amount of the Trust Account checks signed by Wes in his sole capacity was $106,297.30 The Lasher Trust was authorized to purchase new equipment for lease to petitioners. Hetzel, the experienced service manager and employee-shareholder of Lasher Service, recommended to Mark, as Trustee, the need to acquire new automobile service equipment for use by petitioners. Maskow recommended the acquisition of office equipment needed by petitioners. Mark valued the judgment of Hetzel and Maskow and generally followed their recommendations. The leases executed between Lasher Trust and petitioners contain no provision concerning the lease of new equipment purchases. The Lasher VW lease provides a fixed lease payment of $2,645.00 per *376 month during the approximate five year term. The Lasher Porsche-Audi lease contains a fixed lease payment of $1,065.55 per month during the five year term. The renewal provision of each lease was specifically applicable to "only those items listed in Appendix A attached hereto as may still be in use" at end of such lease term. The rental payment of such items subject to renewal was to be two and one half percent of listed value. In practice, the Lasher Trust did not require monthly lease payments as specified within the lease agreements. Petitioners, in fact, paid the Lasher Trust an annual lease payment computed as of the Lasher Trust's fiscal year of February 28. Additionally, the Lasher Trust did not include new equipment acquisitions within its inventory until the beginning of its fiscal year subsequent to acquisition. The timing of petitioners' annual lease payment and the deferred inclusion of new acquisitions within inventory allowed petitioners to use new equipment at a deferred cost up to 23 months. OPINION The sole issue for determination is whether petitioners are entitled under section 162(a)(3) to deduct equipment rental payments as ordinary and necessary business *377 expenses paid to the Lasher Trust pursuant to sale and leaseback transactions of petitioners' automobile service equipment and office furniture. The bulk of the transfer and leaseback cases have arisen in the area of intra-family transfers to trusts, either by sale or gift, followed by a leaseback to the transferor. [8] The parties here concur that the principles established in May v. Commissioner,76 T.C. 7 (1981), affd. 723 F.2d 1434 (9th Cir. 1984), govern our disposition of the issue herein. See Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). [9] Petitioners assert that the requirements of May have been satisfied. Respondent asserts that petitioners have failed to satisfy the May requirements and that the sale of petitioners' subject assets was solely to avoid taxes and devoid of economic reality and business purpose. The resolution of the issue here, therefore, is one of fact that is to be determined by consideration of all the facts and circumstances surrounding the transactions before the Court. *378 The statutory basis to deduct rental expenses as ordinaly and necessary business expenses is section 162(a)(3), which provides in pertinent part: (a) In General.-There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- * * * (3) rentals or other payments required to be made as a condition to the continued use or possession of property to which the taxpayer has not taken or is not taking title or in which he has no equity. In Mattews v. Commissioner,61 T.C. 12 (1973), revd. 520 F.2d 323 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976), [10] and in May,this Court applied the following criteria to determine whether a rental expense deduction under section 162(a)(3) is allowed in the gift and leaseback scenario: (1) The grantor must not retain substantially the same control over the property that he had before he made the gift; (2) *379 The leaseback should normally be in writing and must require payment of a reasonable rental; (3) The leaseback (as distinguished from the gift) must have a bona fide business purpose; and (4) The grantor must not possess a disqualifying "equity" in the property within the meaning of section 162(a)(3). In May v. Commissioner,76 T.C. at 13, we reiterated the four prong standard established in Matthews.The Court of Appeals for the Ninth Circuit, to which an appeal herein would lie, applied the following criteria established in Brooke v. United States,468 F.2d 1155, 1157 (9th Cir. 1972), affg. 300 F. Supp. 465 (D. Mont. 1969), in affirming our opinion in May:
(1) The duration of the transfer; (2) The controls retained by the donor; (3) The use of the gift property for the benefit of the donor; and (4) The independence of the trustee. May v. Commissioner, 723 F.2d at 1436; Brooke v. United States,468 F.2d at 1157. In Brooke, the Court of Appeals for *380 the Ninth Circuit stated that "[m]any decisions pivot on the issue of the independence of the trustee." Brooke v. Commissioner,supra at 1157. The necessary independence of the trustee in Brooke was achieved in a Montana guardianship where a taxpayer, who was an appointed guardian for his children, transferred property to his children and without written lease, leased back such property at a reasonable rent. The Court of Appeals for the Ninth Circuit concluded in Brooke that a court appointed trustee - even if such person was the taxpayer - ensured trustee independence. Brooke v. Commissioner,supra at 1158. In May, the taxpayers deeded their interest in improved real estate to an irrevocable trust for the benefit of their children. The trust instrument appointed the taxpayer and a friend, Harlos Gross, as co-trustees. At the trial in May, Harlos Gross testified that he previously served as trustee for other trusts and was aware of the fiduciary nature of the position as well as the statutory liability imposed on trustees under California state law. May v. Commissioner,76 T.C. at 14. The Court of Appeals *381 for the Ninth Circuit was satisfied that trustee independence was established. May v. Commissioner, 723 F.2d at 1437. Whether a trustee has acted as an independent trustee is a question of fact. Lerner v. Commissioner,71 T.C. 290 (1978). In Lerner we considered the following criteria as persuasive in our determination: (1) the trustee had several appraisals to determine fair rental value; (2) the rent was rendered to the trustee when due; (3) the rent was adjusted to reflect any additional equipment so leased; (4) the trustee exercised prudent business judgment concerning acquisitions of new equipment and the use of borrowed funds; (5) and the trustee, an attorney, was aware of his fiduciary obligations. Lerner v. Commissioner,supra at 302-303. Respondent asserts that facts in the instant case belie a determination that petitioners satisfy the May - Brooke standard. We are persuaded that trustee independence is absent in the instant case. We are also persuaded that petitioners exercised substantial control of the administration and management of the Lasher Trust. The administration of the Trust Account, as *382 provided within the Lasher Trust, was improper from the outset. Wes opened the Trust Account. Mark did not accompany wes to open the Trust Account. Wes was accorded signatory authority concerning the Trust Account with a right of joint survivorship. The Lasher Trust provided Wes no such authority. During the years 1976 through 1979, Wes wrote 81 of the 138 checks negotiated by the Lasher Trust. Wes signed payments of principal and interest remitted by the Lasher Trust to petitioners during such period relative to the notes payable. Wes signed Trust Account checks in total amount of $106,297.30. Maskow prepared all petitioners' checks for Wes' signature. Maskow also performed all bookkeeping services for Lasher Trust, although not compensated by Lasher Trust. Wes testified that his check writing activities concerning the Trust Account were accidental as all checks were prepared by Maskow, appear in similar color, and were apparently comingled with petitioners' checks. There is no evidence of insidious self dealing or wrongful application of Lasher Trust funds by Wes. Nonetheless, Wes simply was not a Trustee of the Lasher Trust. The frequent and substantial actions of Wes *383 concerning the Trust Account belie a determination of trustee independence, but instead, reflect that the Lasher Trust and its assets were dominated and controlled by Wes. Mark was an unassertive and inattentive trustee who manifested little comprehension of his fiduciary responsibilities. Cf. May v. Commissioner, 723 F.2d at 1437; Brooke v. Commissioner, 468 F.2d at 1157-1158. Mark's tacit assent to the check writing activities of Wes is particularly fatal to petitioners' assertions of trustee independence. We are certain that a cursory review of the Trust Account would have alerted Mark to Wes' check writing activities. Further indicia of the absence of the May - Brooke criteria are evident concerning Mark's reliance upon Maskow. Maskow was an officer of petitioners, yet, she performed, without compensation, all bookkeeping services for the Lasher Trust. Maskow also performed bookkeeping services for petitioners. Maskow calculated rental payments due to Lasher Trust from petitioners. The lease agreements recited that such payments were due monthly, however, in practice, full payment was rendered at year end. Cf. Lerner v. Commissioner,supra at 302. *384 The Lasher Trust notes payable to petitioners were due on an annual basis. Maskow paid petitioners' entire rental payment and the Lasher Trust note installment payment at the end of each year. Upon the instruction of Klimen, accountant to petitioners and the Lasher Trust, Maskow made advance payments on the Lasher Trust notes payable to petitioners so as to eliminate any excess Trust Account cash. The Lasher Trust notes payable were written at a below market rate of interest at an annual rate of four percent. The Trust Account was a noninterest bearing account, however, "excess cash" was not permitted to accumulate due the instruction of Klimen and the actions of Maskow. The accounting treatment for billing purposes concerning the new equipment acquisitions of the Lasher Trust indicates the absence of trustee independence and the significant control exercised by petitioners. The Lasher Trust inventory of assets subject to lease reflected new asset acquisitions at the fiscal year end of Lasher Trust subsequent to purchase. Mark relied upon the recommendations of Maskow and Hetzel concerning new equipment purchases of the Lasher Trust.Although Maskow and Hetzel were employee-shareholders *385 of Lasher Service, Maskow was also an officer of petitioners' and Hetzel an officer of Lasher Porsche-Audi during the years at issue. Due to the adopted policy of annual payments, petitioners were able to use new equipment on a deferred payment basis. We can find no affirmative act of trustee independence during the years at issue. We find, instead, substantial facts indicating that petitioners exercised substantial control over the Lasher Trust. The inescapable conclusion is that the Lasher Trust was in fact administered by Maskow and Wes during the years in issue. The Court of Appeals for the Ninth Circuit has clearly established that trustee independence and the degree of control retained by the transferor are critical factors in transfer-leaseback transactions. May v. Commissioner, 723 F.2d at 1437; Brooke v. United States,468 F.2d at 1157. The absence of trustee independence and the significant degree of control exercised by petitioners concerning Lasher Trust assets negate a factual finding that true ownership of subject assets was transferred *386 to the Lasher Trust. Mark, as Trustee, was dominated by Wes and petitioners. Mark was totally unattentive of and unassertive regarding his fiduciary delegations to such a degree that the Lasher Trust was in fact an alter ego of petitioners.The sale and leaseback of petitioners' assets is not, therefore, recognized for tax purposes. We conclude that respondent's disallowance of petitioners' rental expense payments toi Lasher Trust was appropriate under the May - Brooke analysis. Additional comments are pertinent to address respondent's assertion that the sale of petitioners' subject assets and subsequent leaseback was solely to avoid taxes and devoid of economic reality and business purpose. It is well settled that a transfer solely to avoid taxes will not be recognized for tax purposes. Gregory v. Helvering,293 U.S. 465 (1935); Frank Lyon Co. v. United States,435 U.S. 561 (1978), Karme v. Commissioner,73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). For gift and leaseback transactions, this Court and *387 the Court of Appeals for the Ninth Circuit in May adopted the bifurcated analysis established in our opinion in Matthews thereby rejecting the application of the business purpose test to the gift aspect of the transfer. [11] The rationale of this approach is that the expression of donative intent via gift transfer is incompatible with the business purpose test. Commissioner v. Duberstein,363 U.S. 278 (1960). In the sale and leaseback scenario, however, the entire transaction must be examined as an integrated transaction. Where no legitimate business purpose is served and the transaction is simply motivated by a desire to minimize taxes, the transfer and leaseback will be disregarded. W.H. Armston Co. v. Commissioner,188 F.2d 531, 533 (5th Cir. 1951), affg. 12 T.C. 539 (1949). We emphasize that the business purpose must have substance and not be artificial. Shaffer Terminals, Inc. v. Commissioner,16 T.C. 356, 364 (1951), affd. per curiam 194 F.2d 539 (9th Cir. 1952). We think that in the context of this case, petitioners continued need for the subject assets was so compelling that the sale and *388 leaseback must be viewed as an integrated transaction which must satisfy the business purpose test. [12] It is also clear that the business purpose must further the profit objectives of petitioners as business entities and not the personal financial objectivies of the shareholders. Southeastern Canteen Co. v. Commissioner,410 F.2d 615 (6th Cir. 1969), affg. in part a Memorandum Opinion of this Court. We agree with respondent that petitioners' sale and leaseback was devoid of economic reality and advanced no legitimate business purpose. The Lasher Trust was an integral aspect of the overall financial plan developed by financial planners DeJulio and Nicoladze. The sale and subsequent leaseback of petitioners' automobile service equipment and office furnishings was contemplated from the outset. We must evaluate the transactions in correlation with the foregoing to determine whether the indicia of economic reality or business purpose are present. The degree of economic reality or business purpose that must be present in a transaction to be recognized for tax purposes *389 is not capable of precise definition. The business purpose standard is determined from the pertinent facts and circumstances surrounding the transfers, particularly the valuation of the assets sold and the reasonableness of the agreed upon rent. Here, Wes arranged to have petitioners' equipment and office furnishings appraised by regional suppliers of such items. One appraisal of the automobile service equipment and one appraisal of the office furnishings was acquired. The Lasher Trust agreed to purchase petitioners' assets at these appraised values. No additional or comparable appraisals were sought. None of the individuals or concerns who performed the appraisals appeared at trial. The valuation basis of the appraisals was "current replacement costs." In his statutory notices of deficiency, respondent has disregarded the sales for tax purposes but asserts on brief that the purchase price exceeded fair market value. Petitioners bear the burden of proof that respondent's determinations are not correct. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Because we *390 have determined that the sale and leaseback transactions are to be disregarded for tax purposes under the May - Brooke analysis and the business purpose test, we need not embark on the inherently imprecise valuation exercise to determine the fair market value of the transferred assets. We believe, however, that the facts indicate an absence of arm's length negotiation and reflect instead self serving valuations. Peck v. Commissioner,752 F.2d 469 (9th Cir. 1985), affg. a Memorandum Opinion of this Court. The appraisers, who were suppliers to petitioners, were not disinterested parties. Mark, as Trustee, merely accepted the appraised values determinbed by the suppliers and secured by Wes. Further, Mark, as Trustee, performed no independent analysis to determine whether the assets were valued at fair market. The agreed rent upon leaseback was determined by DeJulio and Nicoladze. Neither petitioners nor the Lasher Trust negotiated or modified the suggestions of DeJulio and Nicoladze. Petitioners on brief concede that the rent was not reasonable but asserts that the rate determined by Mecey represents a reasonable rate. Mecey's analysis was flawed in that *391 it assumed the fair market value of the transferred assets to be $150,000, which merely approximates the total purchase price of $146,476. We reiterate that we need not determine a reasonable rent due to our conclusions herein. However, the existence of excessive rent, which we believe is evident here, indicates the absence of arm's-length negotiations and indicates the absence of business purpose. Wes testified that he wanted to involve Mark in the business to develop Mark's business skills and so that Mark, as Trustee, could become familiar with the equipment used by petitioners. Such motivation is not attributed to petitioners and is insufficient to satisfy the requisite business purpose. Southeastern Canteen Co. v. Commissioner,supra.Furthermore, in the sale and leaseback context, if the assets purchased are declining in value and the purchase price is inflated to generate basis, the purchase is illusory because the purchaser is building no equity in the assets. There is no indication in the record that petitioners' sale of assets improved its financial position with creditors or third parties. [13] The only service was incidental to Wes' financial *392 and estate plans. Lastly, we need not restate the factors of the May - Brooke analysis relative to the absence of trustee independence and the retention of significant control by petitioners in the business purpose context. However, we are of the view that such considerations are indicative of the petitioners' failure to establish a legitimate business purpose evidenced by arm's-length transactions. We have addressed the appropriate factors established by the Court of Appeals for the Ninth Circuit in May and Brooke as well as respondent's assertions relative to the business purpose test. In our view the sale and subsequent leaseback of petitioners' assets must be disregarded for tax purposes. We have considered petitioners' other arguments, which we find unpersuasive and contrary to the factual indications. Due to concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and all Rule reference are to the Tax Court Rules of Practice and Procedure.↩
2. The parties have resolved the following issues by stipulation of fact and stipulation of partial settlement: (1) petitioners concede that respondent's disallowance of certain professional fees incurred during the years 1975 and 1976 was appropriate; (2) respondent concedes that petitioners are not liable for additions to tax under section 6653(a)↩ for each of the years in issue; (3) LasherVW concedes that respondent's disallowance of investment tax credit for the year 1976 was appropriate; (4) the parties agree that Lasher Porsche-Audi is entitled to an investment tax credit in the amount of $1,533.00 for the taxable year 1976 and that respondent's disallowance of the balance of the investment tax credit claimed for such year was proper, (5) petitioners concede that respondent's disallowance of certain "labor contract" expenses deducted with respect to service agreements with Lasher Service Corporation during the taxable years 1975 and 1976 was appropriate; (6) LasherVW concedes that respondent's disallowance of certain "management contract" expenses deducted for the taxable years 1975 and 1976 was appropriate.
3. Lasher Investment also was authorized to issue Class B nonvoting preferred stock par value $50.00 per share with an annual dividend privilege equal to three percent of par value and Class C nonvoting common stock par value $10.00 without dividend privileges. At various times during the years at issue, Wes owned differing interests in the Class B and the Class C stock of Lasher Investment. On December 27, 1976, Lasher Investment cancelled Wes' 1000 shares of the Class C stock and issued 500 shares to each of Wes' sons Mark W. Lasher and Scott Ryan Lasher.↩
4. Respondent in his statutory notice of deficiency disallowed the management fee deducted by Lasher VW in the amount of $18,000 with respect to its 1975 tax return and disallowed the "management contract - net" expense in the amount of $10,350 deducted on its 1976 return. Lasher VW has conceded the appropriateness of respondent's determination. See note 2, supra.↩
5. In his notices of deficiency, respondent disallowed amounts accrued by petitioners as of the quarter beginning December 1, 1975, and December 1, 1976, as provided under the "Service Agreement." Petitioners concede the appropriateness of respondent's determination. See note 2, supra.↩
6. Because respondent has denied sale treatment to the transactions at issue, the statutory notices of deficiency reflect the reversal of such gain reported.↩
7. ↩
Trust Account checks drawn
Year
Mark
Wes
Total
% Signed by Wes
1976
6
2
8
25%
1977
7
37
44
84%
1978
13
36
49
73%
1979
31
6
37
16%
57
81
138
8. Carroll v. Commissioner,T.C. Memo. 1978-173↩. 9. In the gift and leaseback scenario, this Court and the Court of Appeals for the Ninth Circuit in May v. Commissioner,76 T.C. 7 (1981), affd. 723 F.2d 1434 (9th Cir. 1984), rejected the view that the entire transaction must satisfy the business purpose doctrine. Such view requires that the gift transaction and the leaseback transaction viewed as a single transaction must be grounded in economic reality. See Matthews v. Commissioner,61 T.C. 12 (1973), revd. 520 F.2d 323 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976); Perry v. United States,520 F.2d 235 (4th Cir. 1975), cert. denied 423 U.S. 1052 (1976); Van Zandt v. Commissioner,341 F.2d 440 (5th Cir. 1965). In May, this Court and the Court of Appeals for the Ninth Circuit adopted a bifurcated analysis which initially determines the validity of the gift of property in trust and then examines the leaseback to determine whether a business purpose for such rentals exists. May v. Commissioner,76 T.C. 7 (1981), affd. 723 F.2d 1434 (9th Cir. 1984); see also Rosenfeld v. Commissioner,706 F.2d 1277 (2d Cir. 1983), affg. a Memorandum Opinion of this Court; Quinlivan v. Commissioner,599 F.2d 269 (8th Cir. 1979), cert. denied 444 U.S. 996 (1979); Brown v. Commissioner,180 F.2d 926 (3d. Cir. 1950) cert. denied 340 U.S. 814 (1950), Skemp v. Commissioner,168 F.2d 598↩ (7th Cir. 1948).
10. See note 9, supra.↩
11. See note 9, supra.↩
12. Carroll v. Commissioner,T.C. Memo. 1978-173↩.
13. Cf. Carroll v. Commissioner,T.C. Memo. 1978-173↩.